COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Felton, Judges Elder, Frank, Kelsey, Haley, Petty,
Beales, Powell and Retired Judge Clements[*]
Argued at Richmond, Virginia

CLAUDE M. SCIALDONE

v. Record No. 1737-06-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE D. ARTHUR KELSEY
JANUARY 13, 2009

BARRY R. TAYLOR

v. Record No. 1738-06-1

COMMONWEALTH OF VIRGINIA


EDWARD JONES, S/K/A
  EDWARD S. JONES

v. Record No. 1739-06-1

COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Patricia L. West, Judge

Marvin D. Miller (Heather Golias; Law Offices of Marvin D. Miller,
on briefs), for appellants.

Donald E. Jeffrey, III, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General, Karri B. Atwood, Assistant Attorney
General; Gregory W. Franklin, Assistant Attorney General, on briefs),
for appellee.


The trial court found Claude M. Scialdone, Barry R. Taylor, and Edward S. Jones in

contempt of court. On appeal, a panel of this Court held the evidence was sufficient to support the

---

[*] Judge Clements participated in the hearing and decision of this case prior to the effective
date of her retirement on December 31, 2008, and thereafter by designation pursuant to Code
§ 17.1-400(D).

contempt findings. <u>Scialdone v. Commonwealth</u>, 51 Va. App. 679, 724-27, 660 S.E.2d 317, 340-41 (2008). The panel remanded the cases for retrial, however, ruling that the trial court improperly conducted a summary contempt proceeding and thereby deprived appellants of due process rights associated with plenary contempt. <u>Id.</u> at 718-24, 660 S.E.2d at 337-41.

At the Commonwealth's request, we agreed to rehear the cases *en banc*. Having done so, we now hold appellants failed to preserve for appeal their argument that the trial court deprived them of due process rights associated with plenary contempt. At no point during the contempt proceeding did appellants object to its summary nature or assert any entitlement to plenary due process rights. Instead, appellants raised these points for the first and only time solely in support of a request under Code § 19.2-319 for bail and a stay of the judgments pending appeal. A motion under Code § 19.2-319, standing alone, does not preserve issues for appeal not previously raised in the trial court.

I.

On July 11, 2006, the trial court began the jury trial of Frankie Dulyea on various criminal charges. Scialdone served as lead defense counsel at trial. Jones, a third-year law student, and Taylor, Scialdone's law partner, assisted the defense. During the course of the trial, the court suspected Scialdone and Taylor had altered a document offered into evidence. The court also became concerned Jones had added insulting language to an exhibit offered for admission into evidence. The court investigated these concerns by examining the documents and by summoning additional witness testimony and documentary evidence. The court heard some of this evidence while Taylor and Jones were not present in the courtroom.

Anticipating where the court's investigation might end, Scialdone stated he would "like to know what [he's] being charged with" because he "may want to have a lawyer for that." In

response, the trial court ruled: "I'm finding you in summary contempt, all three of you . . . . At this point in time that's what's happening." Upon being advised of this finding, neither Scialdone, Taylor, nor Jones objected to the summary nature of the contempt findings. Nor did they request any procedural rights associated with plenary contempt.

Dulyea's jury trial ended three days later. Shortly after the jury had been discharged, the trial court referred back to its ruling made the first day of trial and stated: "Pursuant to Code § 18.2-456, I found all three of you in contempt of court." Upon explaining the rationale behind its ruling, the court sentenced Scialdone, Taylor, and Jones to each serve ten days in jail and pay a $250 fine. Once again, none of the appellants objected to the summary nature of the contempt findings. Nor did they request any of the procedural protections associated with plenary contempt. That same day, appellants filed notices of appeal.

A few days later, appellants filed with the trial court "Motions for Stay of Execution of Sentence."[1] Relying on Code § 19.2-319, they requested a "stay of execution of the sentence pending appeal of the contempt conviction to the Court of Appeals." On July 18, appellants also filed a "Motion for Emergency Stay of Sentence" in this Court requesting that we exercise our authority under Code § 19.2-319 to stay the sentences pending appeal. The motions alleged the trial court had not ruled on the motions to stay pending in the trial court.

We issued an order noting that "the circuit court's oral ruling from the bench" found appellants in contempt of court and sentenced them to an active jail term. See Temporary Stay Order (July 19, 2006). In response, we further noted, appellants had "filed motions, pursuant to Code § 19.2-319, with the circuit court asking that court for a stay of each of the ten-day sentences for contempt of court pending the appeals of these cases." Id. We granted "a temporary stay of

---

[1] Scialdone and Taylor filed their motions in the trial court on July 17. Jones filed his motion on July 18.

- 3 -

the execution of the jail sentences until such time that the circuit court rules on the pending motions filed before it pursuant to Code § 19.2-319." Id. Our remand was specific and limited: "We direct the clerk of the circuit court to forward a copy of the written orders *addressing these motions*" to our clerk of court within 14 days. Id. (emphasis added).

In response to our remand order, the trial court conducted a hearing on the request for a stay pending appeal. At that hearing, appellants argued they should be granted bail in order to pursue an appeal challenging the factual sufficiency of the contempt findings and legal validity of the summary contempt procedures. For the first time during the trial court proceedings, appellants argued the court improperly found them guilty of summary contempt without providing them with prior notice of the charge, an opportunity to prepare a defense, or the benefit of legal counsel. Appellants, however, did not ask the court withdraw its contempt findings, issue a show-cause order outlining the charges, or continue the proceedings so they could retain counsel and prepare a defense. Instead, appellants criticized the summary nature of the contempt proceedings solely as a preview of the arguments they intended to make on appeal.

"[B]ased upon the foregoing," appellants argued, they were entitled to "an order of stay of execution of the sentence[s] pending appeal of the contempt conviction[s] to the Court of Appeals of Virginia." Motions for Stay of Execution of Sentence (July 17-18, 2006). In their attachment to the motions, appellants specifically made clear the scope of their argument to the trial court: "This Court is respectfully requested to consider these authorities in support of the Motion to Stay Execution of Sentence pending appeal." Id. at Attachment A.

The trial court denied the motion for a stay pending appeal. Appellants appealed the trial court's Code § 19.2-319 ruling and eventually secured from the Virginia Supreme Court an order staying execution of the sentences pending appeal.

With the sentences stayed, the appeal continued. Scialdone, Taylor, and Jones filed appellate briefs contending the evidence was insufficient as a matter of law to find them guilty of contempt of court. They also argued that, even if the evidence were sufficient, the trial court erroneously conducted a summary contempt proceeding that, in effect, deprived them of due process rights available under plenary contempt law.

A panel of this Court rejected appellants' challenge to the sufficiency of the evidence, Scialdone, 51 Va. App. at 724-27, 660 S.E.2d at 340-41,[2] but accepted appellants' due process argument and remanded the cases for retrial using plenary contempt procedures. The Commonwealth filed a petition for *en banc* rehearing contesting the panel's decision to remand the cases for retrial. We granted the Commonwealth's petition for rehearing *en banc* to reconsider this issue.

II.

Appellants did not petition for *en banc* rehearing of the panel's decision finding the evidence sufficient and, thus, we need not reengage that aspect of these appeals. See generally Ferguson v. Commonwealth, 51 Va. App. 427, 432-33, 658 S.E.2d 692, 695 (2008) (*en banc*) (holding the *en banc* court would not address issues "affirmed by the panel opinion" for which appellant "did not petition for rehearing *en banc*"). We reinstate the panel opinion as to those issues. Id. We limit our *en banc* review to the question whether appellants properly preserved their appellate challenge to the summary nature of the contempt proceeding and, if so, whether the trial court deprived appellants of procedural rights associated with plenary contempt. Because we answer the first question in the negative, we do not reach the second.

_____

[2] The panel reviewed in detail the circumstances justifying this conclusion as applied to Scialdone and Taylor. Scialdone, 51 Va. App. at 724-27, 660 S.E.2d at 340-41. The Court had earlier refused to consider Jones's sufficiency challenge and that issue was not before the panel. Id. at 724 n.12, 660 S.E.2d at 340 n.12.

III.

Appellants contend the trial court erroneously conducted a summary contempt proceeding and thereby deprived them of due process rights associated with plenary contempt. See generally Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 826-34 (1994). Nothing in the record, however, shows that appellants ever asked the trial court to recognize any specific procedural right associated with plenary contempt. In other words, appellants argue the trial court erroneously deprived them of procedural rights they never requested.

Rule 5A:18 applies to appellate challenges of summary contempts, Singleton v. Commonwealth, 52 Va. App. 665, 672-73, 667 S.E.2d 23, 26 (2008), just as it does to any other non-jurisdictional claim of trial court error. See, e.g., Nusbaum v. Berlin, 273 Va. 385, 406, 641 S.E.2d 494, 505 (2007) (barring argument that the trial court violated defendant's due process rights "by summarily convicting him of indirect [plenary] criminal contempt"). Appellants acknowledge this point but argue their motions under Code § 19.2-319 to stay their sentences satisfy Rule 5A:18. We disagree.

Under Rule 5A:18, raising a legal argument in support of *one* type of relief does not preserve for appellate review the same argument in support of *another* type of relief which was *never* requested. Put another way, when a "party does not simply disagree with the action of the trial court, but seeks the trial court to take action, that action must be expressly sought." Parker v. Commonwealth, 14 Va. App. 592, 596, 421 S.E.2d 450, 453 (1992). Thus, a litigant who has merely "*questioned* the correctness" of the court's order but did not "expressly indicate the action [he] wanted the trial court to take" cannot appeal on the ground that the trial court erroneously failed to take some required action. Widdifield v. Commonwealth, 43 Va. App. 559, 562-63, 600 S.E.2d 159, 161-62 (2004) (*en banc*) (emphasis in original).

This principle uniformly applies to objections to seating jurors,[3] objections to the same evidence from different witnesses,[4] requests for cautionary instructions,[5] objections alleging witness perjury,[6] and objections to irregularities in jury deliberations.[7] In each example, the point is the same: Except in the most egregious of circumstances, a litigant cannot argue on appeal that the trial court erroneously denied him relief which he never specifically asked for in the trial court. See, e.g., Bennett v. Commonwealth, 29 Va. App. 261, 280, 511 S.E.2d 439, 448 (1999) (holding "the objecting party must expressly seek the action that it desires the judge to take"); cf. Gray v. Netherland, 518 U.S. 152, 167-69 (1996) (holding a motion to exclude evidence does not require a trial court to grant a continuance *sua sponte* when the court denies the motion).

---

[3] A party who unsuccessfully objects to rulings made during the *voir dire* of a prospective juror has no appellate complaint as to that juror unless he specifically asked the trial court to strike that juror. See Mu'Min v. Commonwealth, 239 Va. 433, 445 n.6, 389 S.E.2d 886, 894 n.6 (1990); Spencer v. Commonwealth, 238 Va. 295, 306-07, 384 S.E.2d 785, 793 (1989).

[4] Thus, an unsuccessful objection "to the admissibility of certain evidence [is] waived by the failure to object to the same evidence subsequently introduced." Philip Greenberg, Inc. v. Dunville, 166 Va. 398, 404, 185 S.E. 892, 894 (1936). This is true even if "precisely the same fact" was involved and the trial court had earlier rejected precisely the same objection. Id.; see also Portner v. Portner's Ex'rs, 133 Va. 251, 263, 112 S.E. 762, 766 (1922) (holding that, "if it had been error to admit [the challenged evidence] in the first place, subsequent introduction of the same evidence without objection constituted a waiver of the previous objection"); Charles E. Friend, The Law of Evidence in Virginia § 8-4, at 295 (6th ed. 2003) ("Waiver is found where . . . [t]he objecting party fails to object to the same evidence when subsequently introduced by the opponent." (emphasis omitted)).

[5] A party who unsuccessfully objects to evidence cannot appeal on the ground the trial court failed to give a cautionary instruction unless he asked the trial court to give a cautionary instruction. Largin v. Commonwealth, 215 Va. 318, 321, 208 S.E.2d 775, 777 (1974); Berry v. Commonwealth, 22 Va. App. 209, 214, 468 S.E.2d 685, 687-88 (1996).

[6] A defendant's notice to the court that a witness has likely perjured herself is not tantamount to asking the court for a mistrial, an order, or "any specific remedy." Elliott v. Commonwealth, 267 Va. 396, 422, 593 S.E.2d 270, 286 (2004).

[7] A party cannot appeal the trial court's failure to take specific action in response to an irregularity in jury deliberations unless the party asked the trial court to do something about it. See, e.g., Parker, 14 Va. App. at 596, 421 S.E.2d at 453.

- 7 -

This principle, so basic to the nature of the judicial process, undergirds our application of procedural default law. Like most courts, we believe "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." Greenlaw v. United States, 128 S. Ct. 2559, 2564 (2008) (citation omitted). For this reason, courts rely "chiefly on the *parties* to raise significant issues and present them to the courts in the appropriate manner at the appropriate time for adjudication." Sanchez-Llamas v. Oregon, 548 U.S. 331, 356 (2006) (emphasis in original).

In this case, appellants filed motions under Code § 19.2-319 asking the trial court to stay their sentences and admit them to bail pending appeal. We remanded the case for the trial court to address those motions. "Code § 19.2-319 allows for a person who has been convicted of an offense to be released on bail during the pendency of an appeal." Bowling v. Commonwealth, 51 Va. App. 102, 108 n.4, 654 S.E.2d 354, 357 n.4 (2007). In this respect, "a bail proceeding is not an integral part of the guilt-innocence determination. Rather, it is *ancillary* to the criminal prosecution." Askew v. Commonwealth, 49 Va. App. 127, 138, 638 S.E.2d 118, 123 (2006) (quoting Commonwealth v. Smith, 230 Va. 354, 357, 337 S.E.2d 278, 279 (1985)) (emphasis added by Askew). A motion under Code § 19.2-319 does not expressly or implicitly call upon the trial court to reconsider its prior rulings or vacate the judgment being appealed.

In short, appellants never asked the trial court to grant them any procedural right associated with plenary contempt.[8] It would be altogether wrong for us to recast the Code § 19.2-319 motions to stay into *de facto* motions for reconsideration of the merits of the case. Out of "fairness to the trial judge" appellate courts should not "put a different twist on a question that is

---

[8] Appellants do not argue that any exception to Rule 5A:18 applies, and we will not invoke one *sua sponte*. See Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*), aff'd by unpublished order, No. 040019 (Va. Oct. 15, 2004).

at odds with the question presented to the trial court." Commonwealth v. Shifflett, 257 Va. 34, 44, 510 S.E.2d 232, 237 (1999).

If we were to accept appellants' argument, we would impose upon trial courts the *sua sponte* obligation to vacate a conviction on grounds raised for the first and only time during a motion for stay pending appeal when the party standing to benefit from the vacature, the defendant, conspicuously chose *not* to seek such relief. Doing so would be as unprecedented as it would be problematic — particularly in cases where, as here, appellants "may have had a perfectly good reason" for not specifically asking the trial court to proceed under plenary contempt proceedings. Singleton, 52 Va. App. at 672 n.3, 667 S.E.2d at 26 n.3. "One such reason is that the statutory 'constraints' of Code §§ 18.2-456 and 18.2-457 do not apply to plenary, indirect contempt proceedings." Id. (citing Robinson v. Commonwealth, 41 Va. App. 137, 146, 583 S.E.2d 60, 64 (2003)).

In many respects, our case parallels Nusbaum. There, a lawyer was held in summary contempt and argued on appeal he was entitled to due process protections available for plenary contempt. Prior to the entry of the final order, the lawyer stated "specific objections" to the summary proceeding (similar to the ones asserted here) claiming the trial court "violated his due process rights." Nusbaum, 273 Va. at 404, 641 S.E.2d at 504. The lawyer advised the trial court that he presented his specific objections to "make sure" he "preserved any right of appeal" of the summary contempt finding. Id. The court agreed and invited the lawyer "to state on the record his objections to the contempt of court finding." Id. at 406, 641 S.E.2d at 505.

The lawyer in Nusbaum, however, did not ask the trial court to "reconsider and set aside the finding of contempt of court for those reasons." Id. Stating that "he was not requesting the circuit court to reconsider its ruling," the lawyer advised the court that he merely wanted to ensure

that the final order "include the 'particulars' of his objection" to the summary contempt conviction. Id. After hearing the lawyer's specific objections to the contempt finding, the trial court entered a final order confirming its previous bench ruling finding the lawyer in contempt.

On appeal, the lawyer argued that "having made the circuit court aware of his objections, he had no obligation to ask the court to reconsider any matter since the court had the opportunity, within 21 days of entering the final order, to vacate that order and change its rulings." Id. at 402, 641 S.E.2d at 503. The Virginia Supreme Court flatly disagreed. The lawyer could not claim the trial court erred in not vacating its contempt finding on due process grounds, Nusbaum held, because the lawyer never once asked the court to do so. "Those issues, whether the circuit court violated his due process rights by summarily convicting him of indirect criminal contempt, with no notice of the charge, no plenary criminal hearing, and no substitution of the Commonwealth as the prosecuting party, are therefore waived on appeal." Id. at 406, 641 S.E.2d at 505.

Like the lawyer in Nusbaum, appellants in this case never asked the trial court to vacate its oral contempt findings.[9] Nor did they ever seek permission to relitigate the charges using plenary contempt procedures. Both the lawyer in Nusbaum and appellants in this case raised their arguments solely for appellate purposes: the former in an ineffectual effort at preserving the issue for appeal, the latter in an unpersuasive effort to obtain bail pending appeal. In neither instance, however, were the trial courts asked to supply any neglected due process protection. To be sure, the only difference between Nusbaum and this case is the lawyer in Nusbaum said he was not

---

[9] The trial court's oral contempt pronouncements were not merely forewarnings of the court's ultimate decision. In Virginia, contempt orders "orally pronounced from the bench" are immediately effective and enforceable. Rollins v. Bazile, 205 Va. 613, 616, 139 S.E.2d 114, 116 (1964). A written order memorializing an oral contempt finding "does not constitute an integral part of, and should not be confused with, the judgment itself." Id. at 617, 139 S.E.2d at 117; see also Jefferson v. Commonwealth, 269 Va. 136, 139-40, 607 S.E.2d 107, 109 (2005) ("[T]he Rollins principle does not affect the rule that: 'A court speaks only through its orders.'").

asking the trial court to vacate its earlier rulings based upon his objections to the summary process whereas, here, appellants made no such objections in the first place and thus had no reason to disavow them later.

For these reasons, we find it inconsequential that "the trial judge acknowledged she *received and read* appellants' motions for stay *before* she entered the order finding the men in contempt on Wednesday, July 19." *Post* at 23 (emphasis in original). Exactly the same thing could be said about the trial judge in <u>Nusbaum</u>. Prior to the entry of the final order, he heard in open court each of the lawyer's arguments challenging the summary contempt. The objections appeared on the later written order. Yet, like appellants, the lawyer in <u>Nusbaum</u> never asked the trial court to vacate its summary contempt findings so the case could be relitigated using plenary contempt procedures. This disconnect fully negates the assertion that appellants gave the trial court a sufficient opportunity to "correct the alleged error." *Post* at 28. In <u>Nusbaum</u>, as here, the only opportunity being presented to the trial court was the opportunity to *sua sponte* vacate its earlier rulings when the complaining parties conspicuously had not asked it to do so.

IV.

Because appellants never asked the trial court to employ plenary contempt procedures, they will not now be heard to assert the trial court erred by failing to do so. We reinstate the panel's sufficiency holdings and affirm the trial court's findings of contempt against Scialdone, Taylor, and Jones.

<u>Affirmed.</u>

Beales, J., concurring, in part, and dissenting, in part.

In this difficult case, I have concluded that the three appellants did, in fact, preserve their objections to the "summary" contempt proceeding used by the trial court, as the trial court explicitly ruled that the hearing was conducted under the summary contempt statute and reaffirmed that ruling after the appellants presented their written motions discussing the inconsistencies between the trial court's stated intention to hold a summary proceeding and the actual hearing that the court held. The trial court said at the final hearing:

> Although you've been found in summary contempt and thus have no right to counsel, I have, in fact, read all of the papers and information submitted by Mr. Miller and I've also reviewed a memorandum of law submitted by the National Association of Criminal Defense Lawyers.
> It appears that their position is that this is not summary contempt but some other form of contempt. But I do not find their arguments persuasive.

Although this hearing was held to address appellants' motion to stay the execution of their sentences, the trial court clearly considered the substance of appellants' arguments regarding the procedure used by the court to find them in contempt.

Given the recent Supreme Court of Virginia decision in George v. Commonwealth, 276 Va. 767, 773, 667 S.E.2d 779, 782 (2008), although the appellants' arguments and timing in this case were not as specific as we might prefer (and as the majority of this Court would require), I agree with the conclusion of the dissenting opinion that appellants' argument regarding the contempt procedure used here was preserved as the trial court knew of and ruled on appellants' objections. Contrast Nusbaum v. Berlin 273 Va. 385, 402-04, 641 S.E.2d 494, 503-04 (2007) (finding Nusbaum *specifically told the court* that he was not asking that the court reconsider its contempt ruling, thus his argument regarding the court's procedure was not preserved for appeal). Consequently, I believe appellants' Question Presented regarding due process must be addressed.

Contempt charges are tried either with a summary proceeding wherein the trial court acts based on its own observations from the bench or with a plenary proceeding wherein evidence is presented to the trial court and the accused is afforded the traditional due process rights of a defendant. Normally, this difference reflects the nature of the contempt – whether the accused's actions were "direct," i.e., before the court, or "indirect," i.e., outside the presence of the court:

> "The substantial difference between a direct and a constructive [indirect] contempt is one of procedure. Where the contempt is committed in the presence of the court, it is competent for it to proceed upon its own knowledge of the facts, and to punish the offender without further proof, and without issue or trial in any form." (Citations omitted).
>
> "In dealing with indirect contempts -- that is, such as are committed not in the presence of the court -- the offender must be brought before the court by a rule or some other sufficient process; but the power of the court to punish is the same in both cases."
>
> [Burdett's Case,] 103 Va. [838,] 845-46, 48 S.E. [878,] 880-81 [(1904)].
>
> Davis v. Commonwealth, 219 Va. 395, 398, 247 S.E.2d 681, 682 (1978). Indirect or constructive contempt charges, therefore, are not brought summarily, but must proceed under a more formal procedure than an immediate adjudication by the court.

Robinson v. Commonwealth, 41 Va. App. 137, 145-46, 583 S.E.2d 60, 64 (2003) (footnote omitted; alterations in original); see also Cooke v. United States, 267 U.S. 517, 535-37 (1925). Here, the trial court insisted that it was acting under its summary contempt authority. However, as the court took evidence from people who were not in the courtroom when the offending documents were offered into evidence, these proceedings simply could not have been summary in nature. Therefore, I would find that the trial court erred in using the procedure that it followed here.

To determine the appropriate remedy for this procedural error, the sufficiency of the evidence must be considered. Although the majority opinion cites Ferguson v. Commonwealth, 51 Va. App. 427, 432-33, 658 S.E.2d 692, 695 (2008) (*en banc*), to explain why it does not discuss the sufficiency of the evidence to support appellants' convictions, the due process and sufficiency arguments are intertwined in this appeal, as the various issues were not in Ferguson. Id. at 430-32, 658 S.E.2d at 693-95. In addition, Ferguson's remaining questions presented, the ones that the Court *en banc* did not address, related to different convictions than the one that the Court *en banc* did consider. Compare Ferguson v. Commonwealth, 50 Va. App. 351, 355, 649 S.E.2d 724, 726 (2007) (three-judge panel), to Ferguson, 51 Va. App. at 430-32, 658 S.E.2d at 693-95 (sitting *en banc*). Here, the sufficiency and due process arguments relate to the same conviction for each appellant, as evidenced by the three-judge panel's explanation in this case that it addressed the sufficiency question only "insofar as necessary to assure that their retrial on remand will not violate double jeopardy." Scialdone v. Commonwealth, 51 Va. App. 679, 724, 660 S.E.2d 317, 340 (2008). Finally, appellants here won their appeal at the panel level, and, as a result, the one conviction of each appellant was reversed. Conversely, the Ferguson panel opinion reversed only two of Ferguson's convictions and affirmed the other three convictions. Ferguson did not ask for review of any of the three affirmed convictions, and the Commonwealth in appealing the panel's decision regarding one of the felony child neglect convictions did not implicate any of the affirmed convictions or the overturned malicious wounding conviction. Therefore, in Ferguson, 51 Va. App. at 432-33, 658 S.E.2d at 695, the Court appropriately decided that reexamination of the convictions that the three-judge panel affirmed was not appropriate. That same analysis, for the foregoing reasons, does not apply in this case, and, therefore, the sufficiency of the evidence must be addressed.

In the case of appellant Scialdone, the evidence was sufficient to convict him of summary contempt, even if the evidence collected by the trial court about events that occurred outside its presence were excluded. Based solely on the documents presented to the trial court by Scialdone himself as part of his client's defense, the trial court had sufficient evidence to find him guilty of summary contempt of court. The first day of the trial, Scialdone attempted to introduce an exhibit (Exhibit 1), dated July 11, 2006, that listed the rules for a Yahoo chat room. The trial court ruled that Exhibit 1 was irrelevant as the offense for which Scialdone's client was being prosecuted occurred in 2005. Scialdone told the court that he hoped to have the rules for the relevant time period later in the trial. After the lunch break, Scialdone attempted to introduce into evidence a second exhibit (Exhibit 2) that the trial court noted looked exactly like Exhibit 1, except the date was missing from the bottom of Exhibit 2. The court also noticed that the sign-in name for the chat room was different. Scialdone then represented to the court that Exhibit 2 was the document that his client's "father brought to my office when [the client] was arrested." Scialdone repeated this representation later, during argument over admission of Exhibit 2. The court then told Scialdone that he could put his client's father on the stand to provide a foundation for admission of the document. The father testified that, after his son was arrested, he and a relative used his wife's sign-in name, found the chat room rules, printed out two pages, stapled them together, and brought them to Taylor to use in his son's defense. The trial court noted that Exhibit 2 had only one page and that the sign-in name was different from the name that the father testified he had used. Scialdone then claimed he first saw the document during lunch.

At this point, the trial court discovered a connection between Scialdone's secretary and the sign-in name on Exhibit 2, told Scialdone to call his secretary and have her come to the courthouse, and also told Scialdone to have Taylor come to the courthouse. The trial court then

proceeded to take testimony from the secretary and Taylor, asked questions of Scialdone and Jones, and accepted various additional documents that were printed out from the computers in Scialdone's law office. Although both Taylor and Jones were excluded during much of this testimony, Scialdone's counsel acknowledged during oral argument before this Court *en banc* that Scialdone was not excluded from the courtroom by the trial court and was, therefore, present during the entire contempt proceeding as it related to him.

Although Scialdone represented to the trial court that Exhibit 2 had been provided to his office by his client's father, that exhibit was clearly not the one provided by the father, but instead was a copy of Exhibit 1, altered to omit the date. As an attorney and an officer of the court, Scialdone owed a duty of truthfulness and honesty to the trial court. Scialdone's cavalier representation to the trial court that Exhibit 2, a document that he wanted to present to the jury, was authentic – when it clearly was not – violated this duty. Therefore, although the trial court continued to investigate the production of Exhibit 2, that deviation from summary contempt procedure did not unduly affect Scialdone's conviction. Even if the additional testimony and evidence were excluded, the remaining evidence was still sufficient to convict Scialdone of summary contempt of court. Therefore, as the error in these proceedings was harmless beyond a reasonable doubt in relation to Scialdone, see Dearing v. Commonwealth, 259 Va. 117, 123, 524 S.E.2d 121, 124-25 (2000), I agree with the majority opinion's basic conclusion that his conviction should be affirmed, although I reach this conclusion for different reasons.

In contrast, the trial court found Taylor guilty of summary contempt based on the evidence produced by the witnesses that the court examined in its efforts to investigate the production of Exhibit 2 – not based on the documents proffered by Scialdone in open court as evidence in the criminal jury trial over which the court was presiding. The evidence that Scialdone introduced in

an attempt to have Exhibit 2 admitted did not implicate Taylor in any wrongdoing before the trial court. In fact, Taylor was not even in the courtroom until the trial court ordered Scialdone to call and tell him to come to the courtroom.[10] Only after the trial court asked questions of the secretary, Scialdone, Taylor, and Jones did the trial court find that the evidence implicated Taylor in the commission of a fraud on the court. Therefore, the error in relation to Taylor's conviction was not harmless. See id.

As the error was not harmless, and as Taylor argues that the evidence was insufficient to convict him of contempt, I believe we should also consider the sufficiency of the evidence to convict him in order to determine if the conviction should be remanded for retrial or dismissed. See, e.g., Leybourne v. Commonwealth, 222 Va. 374, 377, 282 S.E.2d 12, 14 (1981).

After reviewing the totality of the evidence against Taylor, I would find that the trial court had sufficient facts before it to allow a rational factfinder to conclude that Taylor acted in contempt of court. Taylor was the first person in the law office to see the original document, as the client's father gave the copy of the chat room's guidelines to Taylor rather than to Scialdone. In addition, when the secretary returned to the office at the court's direction to attempt to replicate Exhibit 2, Taylor's computer produced a document exactly like Exhibit 2, except that document had a date at the bottom. Taylor himself admitted that he was in the office when his partner and Jones were working on the case and that he helped them prepare. He also testified that Exhibit 2 was the document given to him by the client's father, and he claimed that, after Scialdone called and asked him to look for it, he found it on a table in their conference room during the criminal trial's lunch break. The secretary testified that Taylor was the attorney who asked her to print off the chat room rules.

---

[10] Although Taylor came to the courthouse with Scialdone's secretary, the trial court excluded Taylor from the courtroom during the secretary's and Jones's testimony.

Considering all these facts, I would find that the evidence was sufficient to support the trial court's finding of contempt. However, this evidence was not properly before the court in Taylor's summary contempt proceedings, and Taylor was improperly excluded from the courtroom during the contempt hearing when the trial court heard important parts of the testimony concerning him. Therefore, I would reverse and remand Taylor's conviction for a new plenary contempt hearing if the trial court or the Commonwealth be so inclined, rather than dismiss the conviction outright based on the procedural errors. Id. Consequently, I must dissent from the majority opinion's affirmation of Taylor's conviction.

Finally, Jones also was found in contempt based on evidence presented after the trial court began taking evidence and questioning witnesses. The trial court had Jones sworn as a witness after hearing testimony from Taylor and the secretary. Jones admitted that he helped prepare the case before trial, but told the trial court that he was not present in the office during lunch. Instead, he went out to eat with his wife and her sister. Jones then admitted that he created and used the offending sign-in name that appeared on Exhibit 1 and that he printed out that document. The trial court then ordered Jones to go outside the courtroom while Scialdone presented his explanations for Exhibits 1 and 2.

Prior to the confession by Jones, the trial court did not have sufficient evidence to convict him of summary contempt. Therefore, the trial court's error was not harmless error in relation to Jones, especially as the trial court also improperly excluded him from the courtroom during part of the contempt proceedings against him. However, unlike Taylor, the sufficiency of the evidence to convict Jones was not actually before us in his appeal, and so, consequently, I would presume that

the totality of the evidence was sufficient to convict him.[11]  Thus, for the foregoing reasons, I

would also reverse Jones's conviction and remand the conviction for a new plenary contempt

hearing, if the trial court or the Commonwealth be so inclined.  See id.

Based on the foregoing analysis, I concur in the majority opinion's conclusion affirming

the trial court's conviction of Scialdone, although I do so on alternate grounds.  However, as I

cannot agree with the majority opinion's affirmation of Taylor's and Jones's convictions, I

respectfully dissent in relation to those appeals, for the foregoing reasons.

---

[11] Jones's petition for appeal regarding the sufficiency of the evidence to convict was not granted.  (Thus, he did not argue to the panel or to the Court *en banc* that the evidence was insufficient to support his conviction.)  Therefore, I agree with the conclusion of the majority that, in relation to Jones, we should not consider the sufficiency of the evidence to support the contempt finding.

Elder, J., with whom Felton, C.J., and Clements, J., join, dissenting.

I believe the majority's application of Rule 5A:18 to bar this appeal reaches new heights in elevating form over substance and extends the boundaries of the rule far beyond those previously set out in Virginia's appellate decisions. Here, appellants objected to the trial judge's finding of contempt when she sentenced them. Although they did not detail the basis for their objection at that time, they did so just a few days later in written motions for stay of execution of sentence, which they filed *before* the trial judge entered an order memorializing her contempt ruling. More importantly, the trial judge acknowledged she *read* the motions *prior* to entering the contempt order. The motions specifically challenged the validity of the contempt rulings, alleging the trial judge, by calling witnesses and gathering evidence, exceeded the bounds of summary contempt proceedings without affording appellants the additional procedural rights to which they were entitled in non-summary proceedings. The trial judge was clearly made aware of appellants' specific objections to the contempt findings at a time when the matters were still within the breast of the court, and the trial judge expressly rejected those arguments in a later ruling on the record denying the motions for stay of execution of sentence. On these facts, I do not believe appellants were required to request a particular form of relief—the vacating or setting aside of the findings of contempt and the related sentences made from the bench but not yet memorialized in a written ruling—in order to satisfy Rule 5A:18. For the reasons set out in the majority opinion at the panel stage, Scialdone v. Commonwealth, 51 Va. App. 679, 710-24, 660 S.E.2d 317, 332-40 (2008), I continue to believe each appellant was denied his right to due process in proceedings that clearly exceeded the bounds appropriate for summary contempt. I also continue to believe remand of Scialdone and Taylor for retrial in proceedings comporting with due process would not offend double jeopardy principles. Id. at 724-27, 660 S.E.2d at 340-41. Thus, I respectfully dissent.

I.

Because I believe the majority opinion fails adequately to recount the sequence of events and some of the key facts related to those events, I briefly detail those here:

When the underlying criminal trial of Frankie Dulyea began in July 2006, Scialdone and third-year law student Jones served as trial counsel. Taylor, Scialdone's law partner, was not present in the courtroom for any of the proceedings in Dulyea's case. Taylor appeared only when, in the midst of trial on Wednesday, July 12, the judge directed Scialdone to use the telephone in the courtroom to summon Taylor and one of the firm's secretaries to come immediately to court. The judge ordered Scialdone not to provide them with any explanation for the judge's demand. Once Taylor and the secretary arrived, a significant portion of the judge's inquiry concerning the questionable exhibit occurred outside the presence of all but Scialdone and before the trial judge ever used the word contempt. Once she did state she was finding the men in contempt, Scialdone and Taylor both challenged the sufficiency of the evidence to support a finding of contempt, arguing the evidence amounted to negligence at most. Scialdone also inquired about the nature of the proceedings and said, "I may want a lawyer," which prompted a ruling from the trial court that the proceedings were for summary contempt. The judge indicated, "We will finish [Mr. Dulyea's criminal] trial and then we will have hearings on [the contempt] matter as far as . . . anything else you might want to say."

Immediately following the conclusion of Dulyea's trial on Friday, July 14, 2006, the trial judge stated the basis for finding each man in contempt and pronounced a sentence of ten days and a $250 fine for each. She ordered Scialdone and Jones to begin serving their sentences on Sunday, July 16, and allowed Taylor to delay reporting until July 24. Taylor responded, "Note our exception for the record please." The three men then filed notices of appeal of the judge's

contempt findings.[12]  However, because the trial court did not enter an order embodying the

contempt rulings and sentences until *after* the notices of appeal were filed, the notices of appeal

did not take effect until Wednesday, July 19, the date on which the final order was entered.  See

Saunders v. Commonwealth, 12 Va. App. 154, 155, 402 S.E.2d 708, 709 (1991).

On Monday, July 17, two days *prior* to the trial judge's entry of the contempt order,

Scialdone and Taylor filed motions for stay of execution of their sentences pursuant to Code

§ 19.2-318.  On Tuesday, July 18, Jones filed an identical motion.  Each of the motions averred

that, although the proceedings were conducted in a summary fashion, "[t]he conduct upon which

the Court relied was not wholly contained within the record of the [underlying criminal]

proceedings [against] Dulyea" and that "[t]he Court conducted an investigation that included

[summoning and] interrogat[ing] . . . witnesses who were not participants in the trial proceedings"

and using the court's deputy sheriff to gather evidence from computers at counsel's law office.

Appellants alleged that because the proceedings were not in fact summary proceedings, they

should have been allowed time to obtain counsel and prepare a defense.  Thus, the basis of the

motions for stay of execution of sentence pending appeal constituted a claim of the likelihood of

success on the merits of the appeals.

On Wednesday, July 19, appellants filed in the Court of Appeals an emergency motion for

stay of execution of sentence indicating two of them were already serving their sentences and that

the circuit court "ha[d] been unwilling to say yes or no" to their motions for stay filed in that

court, which they alleged "[was] tantamount to a denial" of those motions.  The Court of Appeals,

in the course of attempting to resolve appellants' emergency motions, learned the trial court had

---

[12] Scialdone and Taylor filed their notices of appeal on Friday, July 14.  Jones filed his notice of appeal on Tuesday, July 18.

- 22 -

not yet prepared or entered a written order finding the men in contempt. In response to the Court of Appeals' inquiry, the trial judge prepared and entered the written contempt order that day. The record clearly indicates the trial judge acknowledged she *received and read* appellants' motions for stay *before* she entered the order finding the men in contempt on Wednesday, July 19. Manifestly, then, at a time when the trial judge retained authority to set aside the contempt findings and initiate plenary proceedings, she was aware of appellants' claims that the contempt proceedings should not have been conducted summarily and that appellants should have been allowed time to obtain counsel and prepare a defense.

II.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." The purpose of the rule is to avoid unnecessary appeals, reversals, and mistrials by requiring litigants to inform the trial judge of the action complained of so that the judge has the opportunity to consider the issue intelligently and take timely corrective action. See, e.g., Robinson v. Commonwealth, 13 Va. App. 574, 576, 413 S.E.2d 885, 886 (1992). Formal exceptions to rulings are not necessary as long as the party "makes known to the court [*either* (1)] the action which he desires the court to take *or* [(2)] his objections to the action of the court and his grounds therefor." Code § 8.01-384(A).

The majority holds that "Under Rule 5A:18, raising a legal argument in support of one type of relief does not preserve for appellate review the same argument in support of another type of relief which was never requested." (Emphasis omitted.) Although this has been the practical *result* in *some* prior cases under particular factual scenarios, until today, neither this Court nor any

- 23 -

higher appellate court whose decisions are binding upon us has held such a principle *must* be applied in *all* cases. In announcing such a rule, the majority unnecessarily tightens procedural bar boundaries well beyond the text of Rule 5A:18 and Code § 8.01-384(A), which, as quoted above, expressly provides that *either* a statement of the action the objecting party desires the court to take, *i.e.*, the relief he seeks, *or* a statement of his objection to the court's action and the grounds for that objection is sufficient to preserve the objection for appeal.

The cases upon which the majority relies are factually distinguishable and do not dictate the result the majority reaches in this case. In a few well-defined areas, established principles require the objecting party to request a specific form of relief. A classic example is the requirement that a defendant who desires a mistrial must request one promptly upon occurrence of the event on which he claims entitlement to the mistrial; a mere objection to the event or a request for a cautionary instruction is insufficient to preserve the mistrial claim for appeal. See, e.g., Bennett v. Commonwealth, 29 Va. App. 261, 280, 511 S.E.2d 439, 448 (1999); see also Manetta v. Commonwealth, 231 Va. 123, 127 n.2, 340 S.E.2d 828, 830 n.2 (1986) (recognizing the well-settled principle that, where a defendant successfully objects to the admission of evidence and requests that it be stricken or obtains a ruling that evidence is admissible for only a limited purpose, a court has no duty to give a cautionary or limiting instruction unless the defendant specifically requests one).

The majority cites Bennett for the general proposition that "'the objecting party must expressly seek the action that it desires the judge to take.'" However, Bennett involved a very specific factual context—allegedly objectionable comments made by a prosecutor during closing argument in a jury trial. 29 Va. App. at 280, 511 S.E.2d at 448. We made the statement quoted by the majority in that unique context, holding that "*[w]hen allegedly improper comments are made*

- 24 -

*during closing argument in the guilt phase of a [jury] trial*, the objecting party must expressly seek the action that it desires the judge to take." Id. (emphasis added). We listed as the only two choices under those circumstances making a motion for a mistrial or requesting a cautionary instruction. Id. at 280-81, 511 S.E.2d at 448. The Court acknowledged that requiring a defendant to make a prompt, specific request for a mistrial *under these particular circumstances* is a rule requiring "strict application," to which "[t]here appears to be no exception in Virginia law." Id. at 281, 511 S.E.2d at 449. Thus, our holding in Bennett belies the majority's assertion that such a strict rule applies *in every case*.

The majority focuses on this and other situations in which Virginia's appellate decisions have held that a prompt request for a specific type of relief is particularly important to avoid the need for retrial. However, not all situations require a request for a specific form of relief, as Code § 8.01-384(A) expressly acknowledges, or require that the objection be stated at a particular point in time and no other. Unless a more specific rule applies, as is the case for certain mistrial motions, a party challenging a court's determination "may meet the mandates of Rule 5A:18 in many ways." Lee v. Lee, 12 Va. App. 512, 515, 404 S.E.2d 736, 738 (1991) (en banc).

> For instance, counsel may make clear the ground for his objection in a motion to strike the evidence or in closing argument. Counsel may also state the grounds therefor during a motion to set aside the verdict or a motion to reconsider. Likewise, counsel may . . . include an objection and reasons therefor in the final order or at least tender such an order to the trial judge.

Id. at 515-16, 404 S.E.2d at 738 (citations omitted); see George v. Commonwealth, 276 Va. 767, 773, 667 S.E.2d 779, 782 (2008) (reversing the decision of this Court applying Rule 5A:18, holding that "[a]lthough [the defendant] did not use the phrase 'fatal variance,' his arguments before the trial court [in objecting to a jury instruction and moving to set aside the jury's verdict] were sufficient to put that court on notice of his position regarding the inconsistency between the

indictment and the jury instruction"); cf. Jay v. Commonwealth, 275 Va. 510, 517-20, 659 S.E.2d 311, 315-17 (2008) (holding that the Court of Appeals may not *dismiss* on jurisdictional grounds appeals that fail to comply with the requirement of Rules 5A:12(c) and 5A:20(e) that a petition include "[t]he principles of law, the argument, and the authorities relating to each question presented" and that, although the Court may *deny* such appeals on waiver principles, it "should . . . consider whether any failure to strictly adhere to the requirements of Rule 5A:20(e) is insignificant, thus allowing the court to address the merits of a question presented").

Where a party wishes to preserve objections for appeal through a motion filed after entry of the final decree or order, he must obtain a ruling from the trial court in compliance with Rule 1:1 in order to preserve the issue for appeal. See Weidman v. Babcock, 241 Va. 40, 44, 400 S.E.2d 164, 167 (1991); Smith v. Smith, 18 Va. App. 427, 433, 444 S.E.2d 269, 274 (1994). However, where a party makes his objections known to the court prior to or at the time of entry of a final order or decree and does not specifically disclaim the desire to have the court rule on those objections, entry of a final order or decree adverse to those objections constitutes a rejection of them and preserves them under Rule 5A:18 for purposes of appeal. Compare Kaufman v. Kaufman, 12 Va. App. 1200, 1204, 409 S.E.2d 1, 3 (1991) (holding objections were preserved for appeal where the party "made known to the trial court his position through his memoranda and other written correspondence with the court prior to the court's issuance of its amended final decree" and "the trial judge specifically acknowledged the existence of [his] objections"), with Nusbaum v. Berlin, 273 Va. 385, 406-06, 641 S.E.2d 494, 503-05 (2007) (holding the appellant waived the right to challenge his contempt conviction on due process grounds where, *inter alia*, he objected to the trial court's ruling on due process grounds prior to entry of the final order but specifically stated he was not asking the trial court to change the oral ruling already pronounced

and the trial court never ruled on the objections he raised), and Widdifield v. Commonwealth, 43 Va. App. 559, 562-63, 600 S.E.2d 159, 161-62 (2004) (en banc) (in a revocation proceeding in which the trial court ruled the defendant was not entitled to credit for twelve months she previously served in jail as a condition of the suspension of a two-year prison sentence, during which defense counsel said first, "I understand," and then said, without elaboration, "I'm not sure that's how it works," holding counsel's remarks did not make clear what relief, *if any*, counsel desired and, thus, "[a]ppellant failed to state an objection 'together with the grounds therefor' at the time of the ruling").

The majority's assertion in footnote 8 that "contempt orders 'orally pronounced from the bench' are immediately effective and enforceable" is correct as far as it goes, but what the majority does not make clear is that the principle upon which this language is based applies to *all judgments*, not just those for contempt. Rollins v. Bazile, 205 Va. 613, 616-17, 139 S.E.2d 114, 116-17 (1964) (involving trial for contempt following Rollins's "refusing to . . . submit to an examination by a physician appointed by the court to determine whether he was physically able to appear in court and testify"). Further, in deciding Rollins, the Court noted the relevant sequence of events in that case included not only the oral pronouncement of the ruling but also the spreading of an unsigned order memorializing that ruling on the order book on a particular day. Id. at 618, 139 S.E.2d at 118. On those facts, the Court held that the lack of the judge's signature on the order was not dispositive and that "[t]he copy of the order of conviction spread on the order book under date of August 6, 1963, was notice to the petitioner [Rollins] of the judicial determination of the matter," after which, in fact, he filed a timely petition for appeal and motion for bond pending appeal. Id. at 617-18, 139 S.E.2d at 117-18. Thus, to the extent that all oral rulings are immediately effective and enforceable, this fact does not negate the principle that the date of the

- 27 -

court's endorsement of the order, or the date it is spread on the order book without endorsement, is the date from which other relevant time periods are calculated, i.e., the 21-day time limit of Rule 1:1 or the date of effectiveness of a prematurely filed notice of appeal. Cf. Jefferson v. Commonwealth, 269 Va. 136, 139, 607 S.E.2d 107, 109 (2005) ("[W]e point out that the Rollins principle does not affect the rule that: 'A court speaks only through its orders.'" (quoting Cunningham v. Smith, 205 Va. 205, 208, 135 S.E.2d 770, 775 (1964))).

Here, appellants presented their objections to the summary nature of the proceedings in their motions to stay execution of sentence. Although the motions for stay were filed after the trial court's oral pronouncement of sentence and after appellants filed their notices of appeal, the notices of appeal did not take effect until after the trial court entered the written order memorializing its contempt rulings and sentences. The trial court expressly stated that, before it entered the contempt order on July 19, 2006, it read appellants' motions for stay. The trial court clearly was aware of appellants' claims that the contempt proceedings were not in fact summary proceedings and, thus, that they should have been afforded various rights including time to obtain counsel and prepare a defense. The judge had ample notice and opportunity to correct the alleged error before entering the final order but opted to take no action because, as she later detailed on the record in denying the motions for stay, she believed summary proceedings were proper and that appellants received all the rights to which they were entitled.

The Supreme Court's recent holding in Nusbaum does not support a different result. In Nusbaum, the Court relied on dual grounds for concluding his due process objections were barred by that Court's Rule 5:25. 273 Va. at 404, 641 S.E.2d at 504. It emphasized that Nusbaum did not raise his due process objections for the first time until more than two months after the court found him in contempt and that he never requested a ruling on those objections, stating instead,

each time he asserted his objections, that he was not asking the court to change its ruling.  Id. at 404, 641 S.E.2d at 504.  The Court also emphasized that the trial court in fact never ruled on any aspect of the due process objections Nusbaum attempted to raise on appeal.  Id. at 403-04, 641 S.E.2d at 504.  The Court held that because "Nusbaum did not afford the circuit court an opportunity to rule intelligently on the due process issues that he now raises," those issues were "therefore waived on appeal."  Id. at 406, 641 S.E.2d at 505.

The holding in Nusbaum is readily distinguishable from appellants' cases.  Here, during the very first stage of the contempt proceedings on July 12, Scialdone specifically inquired about the nature of the proceedings, whether the contempt was civil or criminal, and said, "I may want a lawyer."  In response, the trial court ruled that the proceedings were for summary contempt.  Although Scialdone did not pursue the issue further at that point, the men objected generally to the contempt findings and punishment pronounced orally on July 14.  Further, within four days after the court's oral pronouncement of appellants' contempt sentences and two days *before* the trial court entered the order memorializing its contempt findings, appellants filed motions challenging those findings on the merits based on the specific due process claims they assert on appeal.  Although these challenges were made via motions to stay execution of their sentences, the contents of the motions made clear that appellants challenged the validity of their convictions and specifically articulated their reasons for that belief.  Further, unlike Nusbaum, who twice specifically disclaimed a desire to have the trial court rule on his objections, the appellants never indicated that they did not wish to have the trial court consider their due process arguments and in fact attempted to obtain a prompt ruling on the motions by the trial court, albeit in the context of seeking a stay of execution of their sentences.  Finally, and key in distinguishing the two cases, in a proceeding held on the record, the trial court made clear it read those motions--and, thus, was

aware of the appellants' due process claims--before it entered the July 19, 2006 order finding appellants in contempt. Unlike in Nusbaum, appellants "afford[ed] the circuit court an opportunity to rule intelligently on the due process issues that [they] now raise[]," id., thereby satisfying the requirements of Rule 5A:18.

III.

Thus, contrary to the position taken by the majority, appellants assumed "responsib[ility] for advancing the facts and arguments entitling them to relief," see Greenlaw v. United States, 128 S. Ct. 2559, 2564 (2008) (citation omitted), and "present[ed] [those arguments] to the court[] in [an] appropriate manner at [an] appropriate time for adjudication," see Sanchez-Llamas v. Oregon, 548 U.S. 331, 356 (2006). To hold that our consideration of this issue on appeal is somehow "[un]fair[] to the trial judge" because it "put[s] a different twist on a question that is at odds with the question presented to the trial court," see Commonwealth v. Shifflett, 257 Va. 34, 44, 510 S.E.2d 232, 237 (1999), is patently wrong, and this principle should not be used to bar consideration of this appeal on the merits.

On the merits, for the reasons set out in the panel's majority opinion, I continue to believe each appellant was denied his right to due process in proceedings that clearly exceeded the bounds appropriate for summary contempt. Scialdone, 51 Va. App. at 710-24, 660 S.E.2d at 332-40. I also continue to believe remand for retrial of Scialdone and Taylor in proceedings comporting with due process would not offend double jeopardy principles. See id. at 724-27, 660 S.E.2d at 340-41.

# VIRGINIA:

*In the Court of Appeals of Virginia on*   **Tuesday**   *the*  **10th**  *day of*  **June, 2008**.

Edward Jones, s/k/a
  Edward S. Jones,                                                                                          Appellant,

 against                        Record No. 1739-06-1
                                   Circuit Court No. CR06-2839

Commonwealth of Virginia,                                                                         Appellee.


Upon a Petition for Rehearing En Banc

Before Chief Judge Felton, Judges Elder, Frank, Clements, Kelsey, McClanahan, Haley, Petty, Beales
and Millette


On May 13, 2008 came the appellee, by the Attorney General of Virginia, and filed a petition

requesting that the Court set aside the judgment rendered herein on April 29, 2008, and grant a rehearing

*en banc* on the issue(s) raised in the petition.

On consideration whereof, the petition for rehearing *en banc* is granted with regard to the

issue(s) raised therein, the mandate entered herein on April 29, 2008 is stayed pending the decision of

the Court *en banc*, and the appeal is reinstated on the docket of this Court.

Notwithstanding the provisions of Rule 5A:35, the following briefing schedule hereby is

established:  Appellant shall file an opening brief upon rehearing *en banc* within 21 days of the date of

entry of this order; appellee shall file an appellee's brief upon rehearing *en banc* within 14 days of the

date on which the opening brief is filed; and appellant may file a reply brief upon rehearing *en banc*

within 14 days of the date on which the appellee's brief is filed.  The appellant shall attach as an

addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter.  It is further ordered that the appellee shall file twelve additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Felton, Judges Elder and Kelsey
Argued at Chesapeake, Virginia


CLAUDE M. SCIALDONE

v.       Record No. 1737-06-1

COMMONWEALTH OF VIRGINIA

BARRY R. TAYLOR

v.       Record No. 1738-06-1                           OPINION BY
                                                  JUDGE LARRY G. ELDER
COMMONWEALTH OF VIRGINIA                                 APRIL 29, 2008

EDWARD JONES, S/K/A
 EDWARD S. JONES

v.       Record No. 1739-06-1

COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                            Patricia L. West, Judge

          Marvin D. Miller (Heather Golias; Law Offices of Marvin D. Miller,
          on briefs), for appellants.

          Donald E. Jeffrey, III, Assistant Attorney General; Karri B. Atwood,
          Assistant Attorney General (Robert F. McDonnell, Attorney General;
          Gregory W. Franklin, Assistant Attorney General, on briefs), for
          appellee.


       Claude M. Scialdone, Barry R. Taylor, and Edward S. Jones each appeal from a finding

of summary contempt for violating Code § 18.2-456.[1]  On appeal, each contends the proceeding

_____

          [1] Because these cases involve interrelated facts and legal issues, we have consolidated
them for purposes of decision.  See, e.g., Surles v. Mayer, 48 Va. App. 146, 155, 628 S.E.2d 563,
567 (2006).

in which he was convicted for contempt was not a summary proceeding and, thus, that he was improperly denied his due process rights,[2] including the rights to pretrial notice, to present a defense, and to be represented by counsel. We hold each of the appellants was denied his right to due process, and we reverse and remand for further proceedings consistent with this opinion if the trial court and the Commonwealth be so advised.

## I. BACKGROUND

Beginning on July 12, 2006, Frankie Dulyea was tried by a jury for several offenses, all of which stemmed from online conversations he had in April and May 2005 with an undercover police officer posing as a twelve-year-old girl. Dulyea was represented by attorneys Claude Scialdone and Barry Taylor, of Scialdone & Taylor, Inc. They were assisted by a law student, Edward Jones. All three men participated in the preparation of Dulyea's case for trial, but Taylor did not appear at trial. Scialdone served as lead counsel at trial, and Jones was present in the courtroom to assist him.

While cross-examining the undercover police officer, Scialdone attempted to ask her about the age-limit rules applicable to the online chat room in which she and Dulyea had conversed. When Scialdone proffered a copy of the rules dated July 11, 2006, the day prior to trial, the Commonwealth objected that the document was irrelevant because it did not cover the proper time period. The court sustained the objection, ruling *inter alia*, "[I]f you want to pursue this line of questioning . . . [,] you would have to have the rules that were in place in 2005." Scialdone responded, "I can introduce that in part of my case. . . . I believe we'll have [the rules that were in place in 2005]."

---

[2] On briefs, appellants also assert their equal protection rights were violated. However, none has articulated any basis for this assertion either on brief or at oral argument. Thus, we conclude each has waived that argument. See Rule 5A:20(c); Littlejohn v. Commonwealth, 24 Va. App. 401, 409, 482 S.E.2d 853, 857 (1997).

Later, when Dulyea was testifying in his own behalf, Scialdone inquired, "After you were arrested, did you make an effort to check out the rules of Yahoo in that chat room that you were in?" The Commonwealth objected that "the rules after [Dulyea] was arrested are not relevant." After excluding the jury, the trial court examined a second set of proffered rules and stated, "[T]he first chat rules [you proffered earlier] . . . had a date on the bottom of 7/11/06. So they were printed yesterday. You've now shown me what appears to be the exact same thing with just no print date on the bottom." Dulyea indicated that the proffered rules "were printed off by my father and my step cousin." The court asked, "Why is there not a print date on the bottom?" and then stated twice, "[I]t's got to have some sort of authentication on it." When the trial court inquired why Scialdone had "print[ed] [them] off again yesterday," Scialdone said they had been unable to locate the copy that Dulyea's father had provided to them. The court noted "it would be very easy" to create such a document by "whit[ing] out the bottom print time and then just run[ning] a copy of it." Scialdone said, "[I]f you want to voir dire us while we're outside the presence of the jury, I have no problem with that."

The trial court then asked the Commonwealth for its position. The Commonwealth agreed with the court's assertion, stating, "It's very suspicious that that document is exactly the same as the document that we objected to earlier today." The trial court then noticed the most recently proffered copy of the rules bore a different "Welcome so and so" line—a different screen name, indicating that a different person had signed on to access the rules. Scialdone argued the challenged document containing the rules was admissible regardless of the presence or absence of a print date because Dulyea would testify both that he was familiar with the rules in place before his online contact with the undercover officer and after and that the proffered document accurately set out those rules. The trial court said, "Well, you can ask him all of those things"; "it's just the document itself that's causing me the problem." The court then indicated

- 3 -

that, in the absence of a print date, the court was "not convinced that this was done at the time – that this is an authentic document. If it were printed out on a computer, it should have a print date on the bottom just like the one you offered a couple of hours ago." The court noted that, although the screen name of the person who printed it was different, that "doesn't mean that it wasn't just gotten. I need to know a date."

Still outside the presence of the jury, Scialdone then called Dulyea's father to the stand in an attempt to authenticate the second set of rules so that the court would admit it into evidence, but as the testimony of the elder Dulyea progressed, it became apparent upon questioning from the court that the copy of the rules he obtained and printed in December 2005 was a two-page document that bore the screen name "pdulyea," one of his wife's screen names, and that the copy of the chat room rules Scialdone had most recently attempted to have admitted was a one-page document showing it had been printed by someone using the screen name "wndydpooh."

The court then inquired of Scialdone what his secretary's name was, and when he answered, "Wendy," the trial court responded, "Yeah. That's what I thought. Get her over here. . . . Right now. Call her from the court because I don't want you to talk to her outside anyone's presence. . . . Just tell Wendy to come over here. She's got five minutes. . . . Tell [Mr. Taylor] to come too. . . . It is 3:19. I'm giving them until 3:30." The court recessed and reconvened at 3:34 p.m. when secretary Wendy Suttlage and attorney Barry Taylor arrived. The judge said, "Mr. Taylor, I need you to go wait out in the hall. . . . Wendy, I need you in here." The judge then showed Wendy Suttlage the chat room rules sheet bearing the screen name "wndydpooh" and questioned her about it. Suttlage testified she printed it out on the Sunday preceding the trial at the request of Mr. Taylor. She did not recall whether the printout included a date at the bottom of the sheet, and she denied having altered the document. The judge then

- 4 -

inquired whether the attorneys had any questions for her. The Commonwealth's attorney responded, "No, Your Honor."

The trial judge then sent Suttlage out of the courtroom and called Taylor to the stand. Taylor testified that he recognized the printout bearing the chat room rules. Upon further questioning, he said he did not know when the sheet was printed but said, "This is the one, I think, that was given to us by our client, Mr. Dulyea." When the trial court said "that would be very interesting since it's under Wndydpooh's user name" and asked Taylor to "[e]xplain it," he responded he "was called and asked to look for the document that the client said he dropped off" and that he "found the document in a pile on the conference room table where they had been working on the case." Taylor denied "whit[ing] out the date at the bottom" or altering the document in any way.

The court then stated as follows, without mentioning the word "contempt," "One of you - one of the three of you, I guess – Mr. Jones, you're in this too – is going to come clean about this. . . . [S]omebody better take the fall or everybody is going to take the fall for this."

The trial court attempted to press Taylor further, but he insisted, "All I was asked to do was to look for the document – look for any document that talked about the adults being in the chat room." He indicated he was very familiar with the rules page because when "we were in preparation for the case, we had looked at this very document multiple times because . . . it was crucial to our case." When the trial court inquired further why Taylor thought the document he retrieved was the document their client had brought to them, he said, "[It was] the only document in the stack that had this material on it."

The trial court then had Suttlage return to the courtroom and, upon further questioning, Suttlage reiterated that she printed the rules the Sunday prior to trial in response to a specific request from Taylor to do so, and she said she handed the document to Taylor. The trial court

then asked Taylor why he presumed the document he received from Suttlage on Sunday was "the one your client gave you two years ago." Taylor responded, "Well, ma'am, it's the same document." When the court said, "Mr. Taylor, you better come clean with me right now. What is going on?" Taylor responded, "I don't know, ma'am," and the judge told him to wait in the hall.

The trial court then swore Jones and questioned him about what it believed was the fraudulent removal of the copyright and date information from the exhibit, but he, too, denied any knowledge of it. The court then asked who "ran . . . off" "this other copy that we rejected this morning that's dated 7/11/2006." Jones responded, "Oh, I ran that off, Your Honor." Changing focus, the trial court then inquired about the screen name on that copy of the exhibit, asking, "Whose idea of a joke is [the screen name, West is a Nazi[3]]? Mr. Scialdone, you better do some talking." (Footnote added). Scialdone said, "Oh, I'll answer every one of your questions," and the court placed him under oath. Scialdone testified:

> I know Mr. Dulyea – when he had retained us, he gave Barry
> [Taylor] a couple of these screen things about adult chat rooms.
> That's my extent of knowledge about it. This morning when they
> handed the one to me that was dated afterwards, I realized we
> needed to find the one that was included in the file; and I asked
> [Taylor] to look in the file to see if they could find it. I don't know
> how to work e-mails and my little windows and stuff in my desk. I
> don't go into any of that stuff. Wendy is not my secretary.
> Antonia is my secretary. I don't – I don't know. Sunday if she
> printed something, she didn't print it for me.

When the trial court inquired once more about "westisanazi," Scialdone again pleaded ignorance about computer matters, and the trial court responded:

> But you know how to white out and copy, I would assume, which
> is what's been done to this document that is being represented as
> being given to you two years ago but was actually run off by your
> secretary or Mr. Taylor's secretary on Sunday.

---

[3] The screen name actually appeared as "westisanazi." Judge Patricia L. West was presiding at Dulyea's trial.

*   *   *   *   *   *   *

There is a serious ethical issue here, if not criminal.

*   *   *   *   *   *   *

Somebody in your firm, Mr. Scialdone – and it's Scialdone and Taylor. So it's you and under your direction, and you're lead counsel in this case. Somebody has perpetrated a fraud on this court, and I will get to the bottom of it. . . . I am finding both you and Mr. Taylor and Mr. Jones – get them back in here – in contempt; and we will deal with it after the trial. And if it comes out that one of you may not have had any knowledge, I may reconsider; but at this point in time all of you are involved.

When Taylor and Jones had come back into the courtroom, the trial judge inquired further, "Whose idea of a joke is [w]estisanazi? Anybody want to fess up to that? . . . . You ran it off, Mr. Jones. Did you do it?" Jones admitted that he did and said he chose the screen name "westisanazi" because "I was very upset about some of the rulings, and I thought it was unfair to the client."

The trial court repeated that it was finding all three men in contempt, saying, "We will finish this trial and then we will have hearings on this matter as far as . . . anything else you might want to say. Otherwise, it will just be sentencing hearings. Is there anything anybody else wants to say right now?" When Mr. Scialdone objected, saying, "I don't think there's any basis of you finding me in contempt," the trial court recited the facts as follows:

THE COURT: I have a document that you tried to offer into evidence, and you argued vehemently that it was a document that your client and his father provided to you two years ago when, in fact, it's a document that your secretary printed out on Sunday for you and Mr. Taylor. Those are the facts.

MR. SCIALDONE: Judge, no one printed anything out for me. That is not true.

THE COURT: You are lead counsel. That was printed out for you and Mr. Taylor. And if Mr. Taylor wants to take the full fall for it, he can; but right now it's both of you on the line . . . and Mr. Jones as well. So if somebody wants to break ranks and rat

- 7 -

somebody out, they can; but otherwise the three of you are in contempt.

The court also said, "these documents will not be coming in unless you can find the ones that have at the top pdulyea and a date at the bottom of 2005, in which case I don't think you can actually find the true documents." Taylor made an unsuccessful attempt to locate the document at the firm's offices in a span of twenty-five minutes allowed by the trial court. At that same time, at Scialdone's request, the court agreed to break for the day and dismissed the jury, but said "you all aren't going anywhere until we get those documents back over here." When Taylor's search failed to reveal the 2005 document, the trial judge directed her baliff to accompany Wendy Suttlage back to the law office and asked Suttlage to try to generate a copy of the chat room rules that were identical to the ones with the screen name "wndydpooh" and no date line. The court recessed for this purpose from 4:49 p.m. until 5:16 p.m.

The trial court ultimately concluded that "[w]hether [the 2005 'pdulyea' chat room rules] actually exist[] or not, that's totally irrelevant" to the contempt issue because the copy of the rules Mr. Scialdone attempted to have admitted bore "a space . . . where evidently something was laid over on the copyright date and it was copied on a copier or it was whited out or something. Because you can see a line on the one that you gave me that is clearly where the copyright was and it's been altered."

Mr. Scialdone then said, "I'd like to know what I'm being charged with, whether it's civil contempt, criminal contempt, or whatever it is. And I may want to have a lawyer for that." The trial court responded,

> Well, right now I'm finding you in summary contempt, all three of you . . . . [O]ne of you all knows what's going on here. It is so obvious that this document has been altered. I mean, there is no other explanation except that one of the three of you or someone in your office or someone in your directions altered the documents and then offered them to the court as something that they are not.

- 8 -

Mr. Taylor then asked to see the documents again – the one bearing the "wndydpooh" screen name Scialdone had offered into evidence and the one bearing the same screen name that Suttlage had generated at the court's request during the recess. When Taylor argued the documents were not the same and that the court's emphasis on the lack of a date line was faulty because "[o]bviously, they must have different pages that can print differently," the court said, "Wendy, I need you to try to get . . . this exact page . . . and print it out. Because . . . when you do, I think it's going to have . . . both the copyright and the date [at the bottom] when you print it out."

While Suttlage was gone a second time, Taylor offered additional testimony about his retrieval of the chat room rules for Scialdone during the lunch recess that day. Taylor argued, "[I]t might be negligence on our part; but I don't think it's contempt judge." The trial judge repeated her finding that the copy had clearly been altered by someone to remove the date.

When Suttlage returned with additional copies of the chat room rules printed from various computers at the law firm's offices, the judge found that the one "printed from Mr. Taylor's computer is the exact replica of the one that was introduced into evidence except for the copyright is gone" where "a piece of paper [was] placed over it and copied off." At 6:18 p.m. the court recessed for the night.

When Dulyea's trial resumed on July 13, Scialdone offered a reconstructed document that appeared to be the 2005 "pdulyea" chat room rules, which he said was found in pieces during a search of his firm's trash. When the Commonwealth objected on grounds of relevance because the rules were dated December 10, 2005, whereas the relevant period was in March 2005, the trial court sustained the objection and refused to admit the copy of the rules. The court also stated, "this has nothing to do with the contempt issue," which involved what the court concluded was offering "an obviously altered document." When Scialdone again protested his

innocence, the court said, "It was an obviously manufactured document, so stop with the charade

on that." "Now whether you knew it or not, I don't know. And I said until someone comes

clean, you are tainted with that. Unless Mr. Taylor wants to come in here and fall on his swor[d]

and say he did it, you're tainted with it."

Following the conclusion of Mr. Dulyea's trial on July 14, 2005, the trial court dismissed

the jury and ruled as follows on the contempt issue:

> Pursuant to Code Section 18.2-456, I found all three of you in contempt of court. Mr. Taylor and Mr. Scialdone, I found that the two of you attempted to perpetrate a fraud upon the court by you, Mr. Taylor, altering the document that was to be presented to this court and you, Mr. Scialdone, for offering that fraudulent document to the court. That very clearly falls under Section 4 of 18.2-456, misbehavior of an officer of the court in his official character.

> You, Mr. Jones, violated Sec[tion] 3 of 18.2-456 which deals with vile, contemptuous, and assaulting [sic] language addressed to or published of the judge for or in respect of any act or proceeding had, or to be had, in such a court. It goes on, but that covers your creating a screen name, West is a Nazi, and then the document obtained with that screen name being offered to the court.

> \* \* \* \* \* \* \*

> I've given a great deal of thought on how to deal with this matter . . . . Now, contempt can range from merely being late to court to under some circumstances progressing to rudeness and disrespect for the court all the way up to what the three of you have done.

> In looking at the continuum of acts that could be considered contempt, I can't think of anything much worse than an attorney creating a false document and offering it to the court as true. If the court can't trust those who are officers of the court to be honest and professional, the whole system will fail. . . .

> To that end, I have come to the conclusion that your dishonesty and unprofessional behavior require the maximum punishment. I'm sentencing each of you to ten days in jail and a $250 fine with a copy of the order to be sent to the Virginia State Bar.

Taylor responded, "Note our exception for the record please," and the trial court responded, "Note everybody's exception." That same day, Scialdone and Taylor filed notices of appeal of the contempt finding.

On July 16, 2006, Scialdone and Jones began serving their sentences as ordered. Taylor, with permission from the trial court, was scheduled to report at a later time so that he could be married and take his honeymoon as previously scheduled.

On July 17, 2006, Scialdone and Taylor filed motions for stay of execution of sentence in which they asserted their right in the contempt proceeding to present a defense and to have counsel. On July 18, 2006, Jones filed both a notice of appeal and a motion for stay of execution of sentence in which he asserted the same rights Scialdone and Taylor had asserted. In addition, the three motions averred that when the trial court found them in contempt at the conclusion of Dulyea's trial, it "read a prepared ruling . . . and immediately left the bench without giving [appellants] the opportunity to present evidence, to present any argument [or] to have the assistance of counsel." Appellants noted they were able merely "to take exception to the [court's] ruling as [the trial judge] was leaving the courtroom." In the memoranda accompanying their motions, appellants asserted that although the proceedings were conducted in a summary fashion, "[t]he conduct upon which the Court relied was not wholly contained within the record of the proceedings of the trial in Commonwealth v. Dulyea" and that "[t]he Court conducted an investigation that included the [summoning and] interrogation of witnesses who were not participants in the trial proceedings" and the use of the court's baliff to gather evidence from computers at counsel's law office. Appellants alleged they should have been allowed time to obtain counsel and prepare a defense.

By July 18, 2006, the men had retained counsel, Marvin Miller, whose offices were located in Alexandria, Virginia. By letter faxed to the trial court that day, Miller sought an

expedited ruling on the motions for stay and requested that, if a hearing on the motion was required, it be conducted by telephone conference that same day. The trial court later indicated it "heard about [the faxed letter]" but that "[s]omebody . . . in the clerk's office said they don't accept faxes" and that, as a result, the trial court "[did not] see [the faxed letter]." The trial court also later indicated the motion was not set for hearing because "[no one] call[ed] [to] set[] it."

On July 19, 2006, by counsel, appellants filed in the Court of Appeals an emergency motion for stay of execution of sentence indicating two of them were already serving their sentences and that the circuit court "ha[d] been unwilling to say yes or no" to their motions for stay filed in that court, which they alleged "[was] tantamount to a denial." The Court of Appeals also received appellants' notices of appeal of their contempt convictions that day. The Court of Appeals, in the course of the attempt to resolve the appellants' emergency motion, learned that the trial court had not yet prepared or entered a written order finding the men in contempt. In response to the Court of Appeals' inquiry, the trial court prepared and entered the written contempt order that day.

The July 19, 2006 contempt order found Scialdone and Taylor in contempt for violating Code § 18.2-456(4) "(misbehavior of an officer of the court in his official character)" and Jones in contempt for violating Code § 18.2-456(3) "(Vile, contemptuous or insulting language addressed to or published of a judge for or in respect of any act or proceeding had, or to be had, in such court or like language used in his presence and intended for his hearing for or in respect of such act or proceeding)." After noting "[t]hese documents are filed and made a part of the record of this contempt proceeding," the court also found "pursuant to § 18.2-456(1) that such misbehavior in the presence of the court obstructed and interrupted the administration of justice," presumably applying this language to the actions of all three men.

Also on July 19, 2006, after receiving the contempt order from the trial court that afternoon via fax, the Court of Appeals "grant[ed] a temporary stay of the execution of [the appellants'] jail sentences until such time that the circuit court rules on the pending motions." The Court of Appeals also "direct[ed] the clerk of the circuit court to forward a copy of the written orders addressing these motions to the clerk of this Court within 14 days of today." Scialdone and Jones were released from incarceration pursuant to that stay.

In proceedings held on July 24, 2006, the trial court indicated it was aware of the filing of the motions for stay of execution of sentence on Monday, July 17, *that it read the motions*, and that it "kept waiting for [the matter] to show up on [the court's] docket" but that "[i]t never did because it was never set." The trial court confirmed that it entered the contempt order on Wednesday, July 19. The trial court also indicated on July 24, 2006, that the fact that the men's attorney "circumvented this Court and went to the Court of Appeals, telling them that we wouldn't hear your case, was not particularly appreciated" "[s]ince you-all didn't bother to set [the motion]."

The trial court then indicated, "[O]nce I got the stay from the Court of Appeals, pending a hearing on the stay, I went ahead and asked our Clerk to put it on the docket for today," and inquired why the men's attorney, Marvin Miller, was not present for the hearing. The men averred that none of them had received personal service of notice that a hearing would be held on July 24. Scialdone also said, "Last night Marvin told me that the hearing was going to be on Thursday, because he had trials this week and could not be here." The trial court responded, "It is not going to be on Thursday because we don't have court reporters on Thursday. It's Monday, Tuesday or Wednesday." Scialdone said, "I don't make the arrangements. I just rely on my lawyer," and the trial court responded, "You don't have a right to counsel anyway. . . . It is a summary proceeding. Do you not understand that?" Scialdone averred, "I believe we have a

- 13 -

right to counsel," and the trial court said, "Well, you can believe anything you like. . . . But I am going to accommodate you, since you have hired counsel. But he will need to be here Wednesday."

The trial court then pressed Scialdone regarding not whether or when he had received personal service but when he had received actual notice of the hearing. Scialdone indicated Miller had told him Sunday evening that the hearing would be Thursday and that he did not have actual notice of a hearing for Monday morning until Monday morning. He indicated he was in court in Norfolk when "they called me [from my office] . . . and they said we had to be here." The trial court noted that on Sunday, Scialdone had arranged to have a court reporter present on Monday and questioned the accuracy of Scialdone's statements about actual notice, and Scialdone responded he had made those arrangements because

> Mr. Miller told me that he should have someone over here this morning . . . [b]ecause, dealing with this court, I am not taking any chances. . . . I don't know what you-all are doing. You don't notice us. No one calls us. No one tells us anything. And if you think I am just going to not send somebody over here, wrong. I will spend a hundred and fifty dollars to make sure.

After additional argument between the court and counsel about notice, the trial court said,

> Mr. Scialdone, I find it very interesting that you didn't have actual knowledge of this hearing until this morning, yet you called the court reporter to have her here at nine o'clock this morning. . . . Frankly, I think it is a lie on your part, if you want to get right down to it. . . . I think you are lying to me. I think you knew that it was set today and that is why you had the court reporter here.

> And you didn't get notice. You are right. I have discovered that problem. I was out of town Thursday and Friday. I have discovered that problem. And that is why I wanted you-all here, because we will set it right now with the three of you here in court. And that is the notice that you will get.

The court then indicated,

> So it needs to be heard on Wednesday. That is a felony day. That is a day when we have a court reporter here. I know you are not

- 14 -

charged with a felony, but this arises out of a felony case. There needs to be a court reporter here. Your attorney's letter says he cannot be here tomorrow. So we will hear it on Thursday I think – Wednesday.

When Scialdone responded, "I think he said – he couldn't be here until Thursday is what he said," the trial court responded, "I don't think his letter says that." Scialdone indicated they would "be glad to provide a court reporter." The trial court responded, "Obviously," and commented further, "His letter says he is in the western district on Tuesday and that is all it says. So he can be here Wednesday." Taylor said, "Okay." At the conclusion of the hearing, the trial court said, "We will see him on Wednesday morning. Please let him know." Apparently, the Clerk's Office also notified Mr. Miller that the hearing would be held on Wednesday "because the Virginia Beach courts hear these matters on Mondays, Tuesdays and Wednesdays."

At the hearing held on Wednesday, July 26, 2005, for which the appellants' attorney was unavailable, the trial court denied the motions for stay of execution of sentence, reasoning as follows:

> Although you've been found in summary contempt and thus have no right to counsel, I have, in fact, read all of the papers and information submitted by [your attorney,] Mr. Miller[,] and I've also reviewed a memorandum of law submitted by the National Association of Criminal Defense Attorneys.
>
> It appears that their position is that this is not summary contempt but some other form of contempt. But I do not find their arguments persuasive. I cannot imagine any worse misbehavior by attorneys in the presence of the court or so near thereto as to obstruct or interrupt the administration of justice than in this case.
>
> Furthermore – that's Subsection 1 of 18.2-456. But 3 and 4 addressing vile, insulting language and misbehavior of an officer of the court in his official character, which I also cited in finding you in contempt, . . . do not have the requirement that the actual act occurred in the courtroom. Even though it's not required except under Subsection 1 to actually have occurred in court, these acts did occur in court and had to be dealt with immediately to preserve the integrity of the trial. While you all may not have intended for

- 15 -

me to see the document containing the screen name West is a Nazi, you nonetheless offered it into evidence. Your intent is irrelevant.

Furthermore, while you may not have actually manufactured in the courtroom the fraudulent document that you offered as authentic, it was certainly continuing in nature because of the fact that you offered it into evidence in the courtroom.

As to the assertions that not everything is on the record, I disagree. I saw what I believed to be unethical conduct on the part of the three of you, and I had an obligation to determine if you were trying to perpetrate a fraud on the court. That appears on the record.

As to obtaining documents from your office, first, there was no objection posed by any of you. Second, I went out of my way to make clear on the record that attorney/client confidentiality would be maintained. And, third, your employee, not my deputy, produced the requested materials. On my direction he was to only escort her to and from court and observe what she did. Again, all of this is on the record and it's very clear, so assertions that something is missing from the record are untrue.

\* \* \* \* \* \* \*

As such, I do not believe that you have a substantial likelihood of prevailing on appeal and thus your request for a stay is denied.

\* \* \* \* \* \* \*

Mr. Scialdone, as recently as Monday you lied to this court. There were several references by your attorney to the potential Monday [July 24, 2006,] hearing date in letters to me dated before Monday. Your court reporter was also called Sunday. Yet you insisted [in the proceedings on Monday, July 24, 2006,] that you only had actual notice of the hearing Monday morning.

There is a pattern of behavior during this entire case that anyone reviewing the matter should be aware of. I dare say that once the entire picture is seen by your supporters, you may find yourself standing alone. I don't see how anyone can read the entire transcript and still defend your unethical, shameless behavior.

Your motion is denied . . . .

Taylor asked the court to "note our exceptions, please."

- 16 -

All three men served portions of their sentences before the Virginia Supreme Court granted a stay of execution of their sentences pending appeal.

## II. ANALYSIS

### A. PROCEDURAL BAR

The Commonwealth contends each appellant waived his right to challenge his summary contempt conviction on due process grounds because he did not properly present these objections to the trial court. Citing Nusbaum v. Berlin, 273 Va. 385, 641 S.E.2d 494 (2007), it contends the due process objections each appellant asserted in his motion for stay of execution of sentence were insufficient to satisfy Rule 5A:18. We hold Nusbaum is distinguishable and that, on the facts of this case, appellants' post-conviction objections coupled with the contents of their motions for stay of execution were sufficient to preserve their objections for appeal.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice."[4] As the Commonwealth expressly acknowledges on brief, the purpose of the rule is to avoid unnecessary appeals, reversals, and mistrials by requiring litigants to inform the trial judge of the action complained of so that the judge has the opportunity to consider the issue intelligently and take timely corrective action. See, e.g., Robinson v. Commonwealth, 13

---

[4] Appellants averred in their motions to stay execution of sentence that the trial court did not give them a chance to make specific objections contemporaneously with her ruling from the bench on July 14, 2006, because "she immediately left the bench" and they were only "able to take exception to [the] ruling as [the judge] was leaving the courtroom." On appeal, appellants make no contention that these allegations provide "good cause" for their failure to object under Rule 5A:18's "good cause" exception. See Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (en banc) (holding Court of Appeals may not raise "good cause" or "ends of justice" exceptions *sua sponte*).

Va. App. 574, 576, 413 S.E.2d 885, 886 (1992).  A party "may meet the mandates of Rule 5A:18 in many ways."  Lee v. Lee, 12 Va. App. 512, 515, 404 S.E.2d 736, 738 (1991) (en banc).

> For instance, counsel may make clear the ground for his objection in a motion to strike the evidence or in closing argument.  Counsel may also state the grounds therefor during a motion to set aside the verdict or a motion to reconsider.  Likewise, counsel may . . . include an objection and reasons therefor in the final order or at least tender such an order to the trial judge.

Id. at 515-16, 404 S.E.2d at 738 (citations omitted).  Formal exceptions to rulings are not necessary as long as the party "makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefor."  Code § 8.01-384(A).

Where a party wishes to preserve objections for appeal through a motion filed after entry of the final decree or order, he must obtain a ruling from the trial court in compliance with Rule 1:1 in order to preserve the issue for appeal.  See Weidman v. Babcock, 241 Va. 40, 44, 400 S.E.2d 164, 167 (1991); Smith v. Smith, 18 Va. App. 427, 433, 444 S.E.2d 269, 274 (1994).  However, where a party makes his objections known to the court prior to or at the time of entry of a final order or decree and does not specifically disclaim the desire to have the court rule on those objections, entry of a final order or decree adverse to those objections constitutes a rejection of them and preserves them under Rule 5A:18 for purposes of appeal.  See Kaufman v. Kaufman, 12 Va. App. 1200, 1204, 409 S.E.2d 1, 3 (1991) (holding objections were preserved for appeal where the party "made known to the trial court his position through his memoranda and other written correspondence with the court prior to the court's issuance of its amended final decree" and "the trial judge specifically acknowledged the existence of [his] objections"); see also Nusbaum, 273 Va. at 402-06, 641 S.E.2d at 503-05 (holding the appellant waived the right to raise due process challenge on appeal of contempt conviction where, *inter alia*, he objected to the trial court's ruling on due process grounds prior to entry of the final order but specifically

stated he was not asking the trial court to change the oral ruling already pronounced and the trial court never ruled on the objections he raised).

The court issued verbal rulings holding Scialdone, Taylor, and Jones in contempt on both July 12 and July 14. On July 12, Scialdone and Taylor both challenged the sufficiency of the evidence to support a finding of contempt, arguing the evidence amounted to negligence at most. Scialdone also inquired about the nature of the proceedings and said, "I may want a lawyer," which prompted a ruling from the trial court that the proceedings were for summary contempt. At the conclusion of the proceedings on those days, the men objected to those rulings only generally. These general objections, standing alone, were insufficient to preserve any specific objections for appeal. However, a court speaks through its written orders, e.g. Walthall v. Commonwealth, 3 Va. App. 674, 679, 353 S.E.2d 169, 171 (1987), and the court did not enter the written order finding appellants in contempt until July 19, 2006. Prior to that entry, each appellant filed a motion for stay of execution of sentence in which he averred that, although the proceedings were conducted in a summary fashion, "[t]he conduct upon which the Court relied was not wholly contained within the record of the [underlying criminal] proceedings [against] Dulyea." Instead, each alleged, "[t]he Court conducted an investigation that included the [summoning and] interrogation of witnesses who were not participants in the trial proceedings" and the use of the court's deputy sheriff to gather evidence from computers at counsel's law office. Appellants alleged that because the proceedings were not in fact summary proceedings, they should have been allowed time to obtain counsel and prepare a defense. Manifestly, the basis of the motions for stay of execution of sentence pending appeal constituted a claim of the likelihood of success on the merits.

Most importantly, the trial court stated on the record that, *prior* to entering the contempt order on July 19, it had received the motions to stay execution of sentence and *had, in fact, read*

*the motions*.  Thus, when the trial court entered the order finding appellants in contempt, it was well aware of their argument that the proceeding was not a summary one and that they believed the trial court erred in failing to afford them certain due process rights.  Although the appellants had filed their notices of appeal prior to that time, these filings did not deprive the trial court of jurisdiction to act on the objections contained in their motions because the early filed notices of appeal did not take effect until the final order was entered on July 19.  See Saunders v. Commonwealth, 12 Va. App. 154, 155, 402 S.E.2d 708, 709 (1991).  In light of the trial court's admission that it read the motions for stay prior to entering the final order, it was irrelevant that the trial court did not formally rule on appellants' motions until after entry of the final order and after the Court of Appeals had acted to enter a stay of execution of their sentences.  Thus, on the facts of this case, appellants' motions to stay execution of sentence and the supporting grounds alleged therein, filed before the trial court entered the final order, were more effective at alerting the trial court to the appellants' objections than would have been the commonly accepted practice of endorsing the final order "seen and objected to" for the same reasons.  See Kaufman, 12 Va. App. at 1204, 409 S.E.2d at 3-4.  Accordingly, we hold that the goals of Rule 5A:18 were met.[5]

The Supreme Court's recent holding in Nusbaum does not compel a different result. Nusbaum, like this case, involved an attorney who was held in contempt under Code § 18.2-456.

---

[5] The dissent states, "The majority's . . . view imposes upon a trial court the *sua sponte* obligation to vacate a conviction on grounds raised for the first and only time during a motion for stay pending appeal when the party standing to benefit from the vacatur[], the defendant, conspicuously chooses *not* to seek that relief."  Our decision clearly states that it rests in large part on the fact that, when appellants filed their motions for stay, the trial judge had *not yet entered final judgment and expressly stated she read the motions for stay before she did so*. Further, as explained in greater detail in the text, supra, only after final judgment was entered did the notices of appeal take effect.  See Saunders, 12 Va. App. at 155, 402 S.E.2d at 709.  Thus, we impose no greater duty on a trial judge than the Court imposed in Kaufman, 12 Va. App. at 1204, 409 S.E.2d at 3.

- 20 -

273 Va. at 396, 641 S.E.2d at 499. Nusbaum's contempt stemmed from an incident in which he was alleged to have shoved another attorney in the presence of the jury, an incident that was seen by the bailiff but not by the trial judge. Id. at 390-95, 641 S.E.2d at 496-99. The court declared a mistrial and disqualified Nusbaum's law firm from further representation of the plaintiffs in that litigation. Id. at 395-96, 641 S.E.2d at 499. At the conclusion of the hearing in which Nusbaum was held in contempt, his attorney noted only a general "objection to the determination of the [c]ourt . . . and to all of the rulings." Id. at 396, 641 S.E.2d at 499.

Shortly after that hearing, Nusbaum moved the court to reconsider its ruling disqualifying his law firm, but in a memorandum accompanying the motion, Nusbaum "advised that he was not asking the court to reconsider any other part of its rulings." Id. At the hearing on the motion, the trial court amended its prior ruling to permit Nusbaum's firm to continue its representation of the plaintiffs. Id. at 397, 641 S.E.2d at 500. Also during that hearing, which was held more than two months after the court first found Nusbaum in contempt, Nusbaum's counsel indicated for the first time that he wanted to note a specific objection to the contempt finding since he had previously voiced only a general objection. Id. He

> asked the circuit court to recite in its order Nusbaum's objection to the summary determination of contempt of court on the grounds that, "where the misconduct is not seen by the judge[,] the defendant has a right to be accorded a trial on that particular issue, and the lack of a trial is a denial of due process." Nusbaum's counsel, however, stated, "*I am not asking [the court] at this time to change [its] ruling*. I am simply going to make sure . . . that I have preserved any right of appeal with respect to the contempt finding."

Id. (emphasis added).

During the "final hearing" six days later, "[a] discussion again arose concerning the objections to the contempt of court finding that Nusbaum wanted to recite in the final order." Id. In the course of that discussion, Nusbaum's counsel "*again stated that he was not requesting the*

- 21 -

*circuit court to reconsider its ruling*" and was merely making sure that the court's final order would "include the 'particulars' of his objection" to the contempt conviction. Id. (emphasis added). When the final order was entered, Nusbaum noted a more detailed due process objection on the final order, contending the conviction violated his rights because, *inter alia*, "it was a summary proceeding with no notice, rule to show cause, or attachment; the alleged contempt was indirect and not personally witnessed by the trial judge, and the contempt charge was not brought by the Commonwealth." Id. at 398 n.4, 641 S.E.2d at 500 n.4.

The Supreme Court concluded that Nusbaum's due process objections were barred under that Court's Rule 5:25. Id. at 403-06, 641 S.E.2d at 503-05. The Court relied on dual grounds for that ruling. Id. at 404, 641 S.E.2d at 504. It emphasized that Nusbaum did not raise his due process objections for the first time until more than two months after the court found him in contempt and that he never requested a ruling on those objections, stating instead each time he asserted his objections that he was not asking the court to change its ruling. Id. at 404, 641 S.E.2d at 504. The Court also emphasized that the trial court in fact never ruled on any aspect of the due process objections Nusbaum attempted to raise on appeal. Id. at 403-04, 641 S.E.2d at 504. Because "Nusbaum did not afford the circuit court an opportunity to rule intelligently on the due process issues that he now raises," the Court held those issues were "therefore waived on appeal." Id. at 406, 641 S.E.2d at 505.

The holding in Nusbaum is readily distinguishable from appellants' cases. Here, during the very first stage of the contempt proceedings, conducted on July 12, Scialdone specifically inquired about the nature of the proceedings, whether the contempt was civil or criminal, and said, "I may want a lawyer." In response, the trial court ruled that the proceedings were for summary contempt. Although Scialdone did not pursue the issue further at that point, the men objected generally to the contempt findings and punishment pronounced orally on July 14.

- 22 -

Further, within four days after the court's oral pronouncement of appellants' contempt sentences and two days before the trial court had entered the order finding the men in contempt, appellants filed motions challenging the contempt findings on the merits based on the specific due process claims they assert on appeal—that the court's decision to proceed summarily violated their rights. Although these challenges were made via motions to stay execution of their sentences, the contents of the motions made clear that appellants challenged the validity of their convictions and specifically articulated their reasons for that belief. Further, unlike Nusbaum, who twice specifically disclaimed a desire to have the trial court rule on his objections, the appellants never indicated that they did not wish to have the trial court consider their due process arguments and in fact attempted to obtain a prompt ruling on the motions by the trial court, albeit in the context of seeking a stay of execution of their sentences. Finally, and key in distinguishing the two cases, in a proceeding held on the record, the trial court made clear it read those motions--and, thus, was aware of the appellants' due process claims--before it entered the July 19, 2006 order finding appellants in contempt.[6] Thus, unlike in Nusbaum, appellants "afford[ed] the circuit court an opportunity to rule intelligently on the due process issues that [they] now raise[]," id., thereby satisfying the requirements of Rule 5A:18.

### B. MERITS

"'Contempt is defined as an act in disrespect of the court or its processes, or which obstructs the administration of justice, or tends to bring the court into disrepute.'" Carter v. Commonwealth, 2 Va. App. 392, 396, 345 S.E.2d 5, 7 (1986) (quoting 4A Michie's Jurisprudence Contempt § 2 (Repl. Vol. 1983)). It includes any act "which is calculated to

---

[6] Seven days after entering the written contempt order on July 19, 2006, after the appellants' notices of appeal became effective, the trial court rejected the due process claims for reasons it clearly articulated on the record, denying the motions for stay of execution of the sentences.

embarrass, hinder, or obstruct the court" in the discharge of its responsibilities. Id. at 396, 345 S.E.2d at 7-8; Potts v. Commonwealth, 184 Va. 855, 859, 36 S.E.2d 529, 530 (1946). "It has long been recognized and established that a court is invested with power to punish for contempt, both by the inherent nature and constitution of the court and by [statute]." Higginbotham v. Commonwealth, 206 Va. 291, 294, 142 S.E.2d 746, 749 (1965); see Nusbaum, 273 Va. at 399, 641 S.E.2d at 501 (recognizing inherent contempt powers).

Both the common law and Virginia's statutes recognize two kinds of contempt, direct and indirect. Carter v. Commonwealth, 96 Va. 791, 807, 32 S.E. 780, 782 (1899); see Code § 18.2-456 (setting out categories of contempts that are considered direct and subject to being punished summarily). Traditionally, direct contempts are those committed within the view of the court and for which immediate vindication of the court's authority and integrity is considered necessary, whereas indirect contempts are those not committed within the view of the court and for which additional procedural safeguards must be provided. E.g. In re Savin, 131 U.S. 267, 274-77, 9 S. Ct. 699, 700-02, 33 L. Ed. 150, 152-53 (1889) (citing 4 William Blackstone, Commentaries on the Laws of England 286 (1769)); Burdett v. Commonwealth, 103 Va. 838, 845-46, 48 S.E. 878, 880-81 (1904). Direct contempts may be punished summarily. E.g. Burdett, 103 Va. at 845-46, 48 S.E. at 880-81. The word "summarily" when used with respect to contempt "refers not to the time the adjudication must be made, but to the form of the procedure which dispenses with any further proof or examination and a formal hearing." Higginbotham, 206 Va. at 294, 142 S.E.2d at 749.

> Where the contempt is committed in the presence of the court, it is competent for it to proceed upon its own knowledge of the facts, "and to punish the offender without further proof, and without issue or trial in any form." Ex parte Terry, 128 U.S. 289, 9 S. Ct. 77, 32 L. Ed. 405 [(1888)]. In dealing with indirect contempts – that is, such as are not committed in the presence of the court – the

offender must be brought before the court by a rule or some other sufficient process . . . .

Burdett, 103 Va. at 845-46, 48 S.E. at 880-81 (citations omitted).

"[O]nly '[t]he least possible power adequate to the end proposed' should be used in contempt cases." United States v. Wilson, 421 U.S. 309, 319, 95 S. Ct. 1802, 1808, 44 L. Ed. 2d 186, 194-95 (1975) (quoting Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231, 5 L. Ed. 242, 248 (1821)). "Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice," only the latter of which they may properly punish as contempt. Brown v. United States, 356 U.S. 148, 153, 78 S. Ct. 622, 626, 2 L. Ed. 2d 589, 596 (1958). "Summary punishment always, and rightfully, is regarded with disfavor . . . ." Sacher v. United States, 343 U.S. 1, 8, 72 S. Ct. 451, 454, 96 L. Ed. 717, 723 (1952).

Code § 18.2-456 provides in relevant part as follows:

> The courts and judges may issue attachments for contempt, and punish them summarily, only in the following cases:
>
> (1) Misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice;
>
> (2) Violence, or threats of violence, to a judge or officer of the court, or to a juror, witness or party going to, attending or returning from the court, for or in respect of any act or proceeding had or to be had in such court.
>
> (3) Vile, contemptuous or insulting language addressed to or published of a judge for or in respect of any act or proceeding had, or to be had, in such court, or like language used in his presence and intended for his hearing for or in respect of such act or proceeding;
>
> (4) Misbehavior of an officer of the court in his official character;
>
> (5) Disobedience or resistance of an officer of the court, juror, witness or other person to any lawful process, judgment, decree or order of the court.

- 25 -

The legislature also has limited the punishment that may be imposed in cases of summary contempt falling under subdivision (1) of Code § 18.2-456. Pursuant to Code § 18.2-457, "No court shall, without a jury, for any such contempt [under Code § 18.2-456(1)], impose a fine exceeding $250 or imprison more than ten days . . . ."[7] The range of punishment a circuit court is authorized to impose for summary contempt under the other subsections of Code § 18.2-456 is not governed by statute. See Code § 18.2-458 (granting district court judges "the same power . . . as a . . . circuit court [judge] to punish summarily for contempt" except that "in no [district court contempt] case shall the fine exceed $250, or the imprisonment exceed ten days"). Although the statute authorizes trial judges to punish summarily in the enumerated situations, summary punishment is not mandatory. Further, the trial court retains common law authority to punish, in nonsummary fashion, types of contempt not enumerated in the statute. E.g. Robinson v. Commonwealth, 41 Va. App. 137, 145-46, 583 S.E.2d 60, 64 (2003) (involving nonsummary contempt proceeding for attorney's failure to appear).

On appeal, each appellant contends the imposition of summary punishment on the facts of this case violated his rights to notice, to prepare a defense and be present for trial, to the assistance of counsel, and to assert a privilege against self-incrimination. Each points to the trial court's summoning witnesses to testify and having those witnesses obtain evidence for the court's review as indicia that the proceeding in which each was convicted was not, in fact, a summary proceeding and, thus, that each appellant was entitled to those due process rights listed above. Evaluating the court's power to summarily convict for contempt in light of the due process requirements imposed on the states by the Fourteenth Amendment to the United States

---

[7] Although Code § 18.2-457 requires a jury before heightened punishment may be imposed for subdivision (1) offenses, it also provides that "in any such case the court may, without an indictment, information or any formal pleading, impanel a jury to ascertain the fine or imprisonment proper to be inflicted and may give judgment according to the verdict."

Constitution,[8] we hold that the contempt convictions of Scialdone, Taylor, and Jones violated due process and must be set aside.

As the United States Supreme Court has recognized, "Longstanding precedent confirms the power of courts to find summary contempt and impose punishment." Pounders v. Watson, 521 U.S. 982, 987, 117 S. Ct. 2359, 2361, 138 L. Ed. 2d 976, 981 (1997).

> To preserve order in the court room for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court when occurring in open court. There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of the common law and *the punishment imposed is due process of law*.

Cooke v. United States, 267 U.S. 517, 534-35, 45 S. Ct. 390, 394, 69 L. Ed. 767, 773 (1925) (emphasis added).

As the United States Supreme Court has made clear, the power to punish summarily for contempt is limited because it provides "an exception to the normal due process requirements, such as a hearing, counsel, and the opportunity to call witnesses." Pounders, 521 U.S. at 988, 117 S. Ct. at 2362, 138 L. Ed. 2d at 982.

_____

[8] The United States Supreme Court has never expressly equated the rights protected against state invasion by the Fourteenth Amendment's Due Process Clause with those protected against federal invasion by the Fifth Amendment's almost identically worded Due Process Clause. See U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property without due process of law."); U.S. Const. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property without due process of law."). Nevertheless, in the area of defining what constitutes in-court conduct punishable as summary contempt and the basic procedural due process safeguards to be followed in its exercise, the Court has treated the coverage of the Fifth and Fourteenth Amendment Due Process Clauses as coextensive without comment. See In re Oliver, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948) (applying existing federal case law on summary contempt to state habeas appeal); see also Pounders v. Watson, 521 U.S. 982, 987-89, 117 S. Ct. 2359, 2361-62, 138 L. Ed. 2d 976, 981-82 (1997) (implicitly equating Due Process Clauses for purpose of assessing limits on a state's authority to issue a summary contempt order but reserving to "the states . . . latitude in determining what [in-court] conduct so infects orderly judicial proceedings that contempt is permitted").

> [F]or a court to exercise the extraordinary but narrowly limited power to punish for contempt without adequate notice and opportunity to be heard, the court-disturbing misconduct must not only occur in the court's immediate presence, but . . . the judge must have personal knowledge of it acquired by his own observations of the contemptuous conduct.

In re Oliver, 333 U.S. 257, 274-75, 68 S. Ct. 499, 508, 92 L. Ed. 682, 695 (1948); see

Gilman v. Commonwealth, 275 Va. 222, 227-28 & n.1, 657 S.E.2d 474, 476 & n.1 (2008)

(acknowledging distinctions between direct and indirect contempt and noting that Gilman did not

"contest the characterization of her conviction as one of direct contempt").  In short, the power to

punish summarily covers "only charges of misconduct, in open court, in the presence of the

judge, which disturbs the court's business, *where all of the essential elements of the misconduct*

*are under the eye of the court [and] are actually observed by the court*."[9]  Oliver, 333 U.S. at

275, 68 S. Ct. at 509, 92 L. Ed. at 695 (emphasis added); see also Savin, 131 U.S. at 277, 9 S. Ct.

at 702, 33 L. Ed. at 153; Terry, 128 U.S. at 309, 9 S. Ct. at 81, 32 L. Ed. at 410.  "If some

essential elements of the offense are not personally observed by the judge, so that he must

depend on statements made by others for his knowledge about these essential elements, due

process requires, according to the Cooke case, that the accused be accorded" his procedural due

process rights, including "adequate notice and opportunity to be heard."  Oliver, 333 U.S. at

275-76, 68 S. Ct. at 509, 92 L. Ed. at 695, quoted with approval in Johnson v. Mississippi, 403

---

[9] In summary proceedings,

> where the offender is a lawyer representing a client on trial, [punishment for summary contempt] may be postponed until the conclusion of the [trial]. . . .  Even where summary punishment for contempt is imposed during trial, "the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocution."

Taylor v. Hayes, 418 U.S. 488, 498, 94 S. Ct. 2697, 2703, 41 L. Ed. 2d 897, 907 (1974) (quoting Groppi v. Leslie, 404 U.S. 496, 504, 92 S. Ct. 582, 587, 30 L. Ed. 2d 632, 639 (1972)).

- 28 -

U.S. 212, 215, 91 S. Ct. 1778, 1780, 29 L. Ed. 2d 423, 426 (1971); see Groppi v. Leslie, 404 U.S. 496, 504, 92 S. Ct. 582, 587, 30 L. Ed. 2d 632, 639 (1972) (noting that "[w]here a court acts immediately to punish for contemptuous conduct committed under its eye, . . . there is no question of *identity* . . . because the judge has personally seen the offense and is acting on the basis of his own observations" (emphasis added)).

Applying these principles in Johnson, the United States Supreme Court reversed a summary contempt conviction both because too great a delay occurred between the allegedly contemptuous act and the contempt proceeding and because the judge denied the contemnor's "request for a hearing on the merits" even though the record did not establish that the judge "was personally aware of the [in-court] contemptuous action when it occurred." 403 U.S. at 215, 91 S. Ct. at 1780, 29 L. Ed. 2d at 426. The Court noted, "It would seem, therefore, that a fair hearing would entail the opportunity to show that the version of the events related to the judge was inaccurate, misleading, or incomplete." Id.; see also Cologne v. Westfarms Assocs., 496 A.2d 476, 482-83 (Conn. 1985) (applying Johnson's holding that judge must have personal knowledge of the "essential elements" to punish a contempt summarily); People v. Jashunsky, 282 N.E.2d 1, 4 (Ill. 1972) (same).

Further, as one federal circuit court of appeals noted in a case involving an altercation that occurred in the courtroom, even where the misbehavior occurs fully in open court,

> if the situation was so confused that the judge could not clearly
> observe and accurately record what each defendant had done,
> summary conviction [is] inappropriate. . . . [T]he theory [behind
> allowing summary contempt][10] is that no hearing is necessary

---

[10] The original quoted passage from Marshall refers to the summary contempt provision of Federal Rule of Criminal Procedure 42. That rule merely codified accepted constitutional principles applicable to summary contempt proceedings, e.g. Offutt v. United States, 348 U.S. 11, 13-14, 75 S. Ct. 11, 13, 99 L. Ed. 11, 16 (1954) (quoting Advisory Committee's note that the enactment of Rule 42, which took effect in 1946, was "'substantially a restatement of existing law, Ex parte Terry, 128 U.S. 289; Cooke[], 267 U.S. 517, 534'"), which the Court has applied in both federal and state cases, see supra note 8.

> because the judge already knows the facts. If he does not know the facts, a hearing is necessary to discover what the facts are. If, despite the uncertainty, no evidentiary hearing is had, the obvious risk is that innocent persons may be summarily adjudicated and punished.

United States v. Marshall, 451 F.2d 372, 377 (9th Cir. 1971) (footnote added). Under such circumstances, "the proper practice is, by rule or other process, to require the offender to appear and show cause why he should not be punished." Id.

As the United States Supreme Court has explained,

> th[is] distinction finds its reason not any more in the ability of the judge to see and hear what happens in the open court than in the danger that, unless such an open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public in the "very hallowed place of justice," as Blackstone has it, is not instantly suppressed and punished, demoralization of the court's authority will follow. Punishment without issue of trial was so contrary to the usual and ordinarily indispensable hearing before judgment, constituting due process, that the assumption that the court saw everything that went on in open court was required to justify the exception; but the need for immediate penal vindication of the dignity of the court created it.
>
> When the contempt is not in open court, however, there is no such right or reason in dispensing with [due process].

Cooke, 267 U.S. at 536, 45 S. Ct. at 394-95, 69 L. Ed. at 773-74.

Therefore, due process of law in the prosecution of contempt,

> *except that committed [entirely] in open court*, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. . . . [T]his includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty.

Id. at 537, 45 S. Ct. at 395, 69 L. Ed. at 774 (emphasis added); Oliver, 333 U.S. at 274-76, 68 S. Ct. at 508-09, 92 L. Ed. at 695. These rights also include trial before an unbiased judge, Johnson, 403 U.S. at 215-16, 91 S. Ct. at 1780, 29 L. Ed. 2d at 427; see Taylor, 418 U.S. at 501,

94 S. Ct. at 2704-05, 41 L. Ed. 2d at 909, entitlement to a presumption of innocence, proof of guilt beyond a reasonable doubt, and the right against self-incrimination, Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 444, 31 S. Ct. 492, 499, 55 L. Ed. 797, 807 (1911), cited with approval in Intern'l Union v. Bagwell, 512 U.S. 821, 826, 114 S. Ct. 2552, 2556-57, 129 L. Ed. 2d 642, 651 (1994) (stating "'[indirect] criminal contempt is a crime in the ordinary sense,' Bloom v. Illinois, 391 U.S. 194, 201 (1968), and 'criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings,' Hicks v. Feiock, 485 U.S. 624, 632 (1988)," and citing cases setting out the particular constitutional protections applicable to nonsummary contempt proceedings). See Gilman, 275 Va. at 228-31, & n.2, 657 S.E.2d at 476-78 & n.2 (in appeal of a district court summary criminal contempt finding on the district judge's Code § 18.2-459 certificate, (1) holding the applicable procedural safeguards derive from the Due Process Clauses because such proceedings are not "'criminal prosecutions'" within the meaning of the Sixth Amendment and, thus, that the contemnor "did not have a Sixth Amendment right of confrontation" in her circuit court appeal, and (2) overruling Baugh v. Commonwealth, 14 Va. App. 368, 417 S.E.2d 891 (1992), to the extent its holding "is inconsistent with the holding we express here"). Further, the right to assistance of counsel and to a jury attach in nonsummary contempt proceedings under the same circumstances as for any other crime. See Bagwell, 512 U.S. at 826-27, 114 S. Ct. at 2557, 129 L. Ed. 2d at 651 (holding that "[f]or 'serious' criminal contempts involving imprisonment of more than six months, . . . the right to jury trial" applies); Bloom, 391 U.S. at 198, 211, 88 S. Ct. at 1480, 1487, 20 L. Ed. 2d at 526, 534 (holding "serious contempts are so nearly like other serious crimes that they are subject to the jury trial provisions of the Constitution"); Argersinger v. Hamlin, 407 U.S. 25, 37, 92 S. Ct. 2006, 2012, 32 L. Ed. 2d 530, 538 (1972) (holding that "absent a knowing and intelligent waiver, no person may be imprisoned

- 31 -

for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial").

## 1. Finding of Contempt Against Scialdone

Based on our constitutional due process analysis above, we hold Code § 18.2-456 may be constitutionally applied to permit Scialdone to be punished summarily for contempt only to the extent it delineates behavior that Scialdone engaged in "under the eye of the court" and that was "actually observed by the court." Oliver, 333 U.S. at 275, 68 S. Ct. at 509, 92 L. Ed. at 695. "If some essential elements of the offense [were] not personally observed by the judge, so that [she had to] depend on statements made by others for [her] knowledge about these essential elements, due process require[d] . . . that [Scialdone] be accorded" his procedural due process rights. Id. at 275-76, 68 S. Ct. at 509, 92 L. Ed. at 695.

Under settled principles, "[d]eceit by an attorney may be punished as a contempt if the deceit is an abuse of the functions of his office . . . ." Clark v. United States, 289 U.S. 1, 12, 53 S. Ct. 465, 468, 77 L. Ed. 993, 999 (1933). Submission of a document that is wholly fraudulent or contains falsehoods is punishable as contempt. United States v. Ford, 9 F.2d 990, 991-92 (D. Mont. 1925), cited with approval in Clark, 289 U.S. at 12, 53 S. Ct. at 468, 77 L. Ed. at 999. "[L]ack of actual knowledge [of the fraud or falsehoods] does not constitute a defense, but only an extenuating circumstance in mitigation. It is counsel's duty to know the contents of documents he presents . . . , and presentation is a representation that this duty has been performed. It is presumed he knows." Ford, 9 F.2d at 991.

Thus, here, Scialdone's proffer to the court of the chat room rules that bore no copyright or print date, if a contempt because the document was fraudulent, was a contempt for which Scialdone could be punished summarily. Assuming for the moment that the absence of the copyright and print dates was sufficient, without more, to support a finding that the document

had been fraudulently altered, the contempt was complete when Scialdone offered the document into evidence.[11] Because "'all of the essential elements of the misconduct [occurred] under the eye of the court [and] [were] actually observed by the court,'" Pounders, 521 U.S. at 988, 117 S. Ct. at 2362, 138 L. Ed. 2d at 982 (quoting Oliver, 333 U.S. at 275, 68 S. Ct. at 509, 92 L. Ed. at 695), the court had the authority to punish Scialdone summarily at that time if the evidence was sufficient to establish someone had altered the document by removing the dates.

However, the trial court did not in fact punish Scialdone summarily at that time and did not indicate at that time that it was even entertaining the idea of holding him in contempt. Instead of proceeding summarily against Scialdone, the court ordered Scialdone to telephone Taylor, his law partner, and Wendy Suttlage, one of the firm's secretaries, and "[g]et [them] over here. . . . Right now." The trial court then questioned Suttlage, Taylor, Jones, and Scialdone extensively to determine who had printed the document and when. Under questioning from the court, no one admitted having altered the document. Only then did the trial court make an express finding that someone had "white[d] out" and "cop[ied]" the chat room rules in order to remove the date; observe that Scialdone was lead counsel; and indicate it was finding Scialdone, Taylor, and Jones all in contempt.

The court did not stop there, however. It asked Suttlage to try to generate a copy of the chat room rules that were identical in format to the ones Scialdone had offered into evidence, and it had the court deputy accompany Suttlage back to the firm's offices for this purpose. When that trip failed to yield a copy of the rules identical to the ones Scialdone had offered, the trial court sent Suttlage back to the firm to try a second time, saying, "I need you to try to get . . . this exact page[,] [g]et it looking just like this and print it out[,] [b]ecause . . . when you do, I think

---

[11] We analyze the sufficiency issue in detail in Part II.B.4., infra, for purposes of ascertaining whether double jeopardy principles permit remand for a retrial.

it's going to have the copyright here and it's also going to have [the date] at the bottom." Thus, although the court had already found "[i]t is so obvious that this document has been altered," it was attempting to obtain additional evidence to prove that the document had been altered. After Suttlage generated a document from Taylor's computer that the court found was "the exact replica of the one that was introduced into evidence except for the copyright is gone" where "a piece of paper [was] placed over it and copied off," the court recessed for the evening. Following the conclusion of Dulyea's trial, the court found Scialdone attempted to perpetrate a fraud on the court by offering a fraudulent document to the court.

Thus, assuming without deciding that the absence of the copyright and print dates was sufficient, without more, to support a finding that the document had been fraudulently altered, the contempt was complete when Scialdone offered the document into evidence. To the extent the trial court had the authority to punish Scialdone summarily without hearing any additional evidence, it did not do so. Because the court did not proceed to punish Scialdone summarily and engaged in extensive efforts to obtain more evidence on the issue, Scialdone was entitled to the due process rights available in a nonsummary contempt proceeding. Further, the degree of Scialdone's culpability was not discernable without the court's examination of Taylor and Jones to determine their respective levels of culpability, as well. Thus, "[u]nder the particular facts and circumstances here, we are of the opinion that even though the alleged misbehavior . . . by [Scialdone] was committed in the presence of the court [when he offered the allegedly fraudulent exhibit into evidence], the [court] should have had a rule specifying the alleged contemptuous acts served on [Scialdone], to be followed by a full hearing in the matter, instead of exercising [its] discretionary summary power under Code § [18.2-456]." Higginbotham, 206 Va. at 296, 142 S.E.2d at 750.

Accordingly, we reverse Scialdone's contempt conviction.

## 2. Finding of Contempt Against Taylor

Applying the principles set out above, we hold the trial court had no authority to punish Taylor summarily. Scialdone and law student Jones were the only people who made formal appearances at Dulyea's trial. Taylor did not formally appear for Dulyea's trial and was not present in court when Scialdone offered the allegedly fraudulent exhibit into evidence. At that time, the court had no knowledge, other than the fact of Taylor's status as Scialdone's law partner, that Taylor was involved in any way with the preparation of the document at issue or the submission of the document into evidence at trial. Thus, it was not true that "'all of the essential elements of [Taylor's] misconduct [occurred] under the eye of the court [and] [were] actually observed by the court.'" Pounders, 521 U.S. at 988, 117 S. Ct. at 2362, 138 L. Ed. 2d at 982 (quoting Oliver, 333 U.S. at 275, 68 S. Ct. at 509, 92 L. Ed. at 695).

Before learning of Taylor's involvement, the court questioned Scialdone about who used the screen name "wndydpooh." Scialdone said he could not answer that question and that he had not even seen the exhibit "until lunchtime." The trial court then asked Scialdone what his secretary's name was, and when he answered, "Wendy," the trial court responded, "Yeah. That's what I thought. Get her over here." The court had Scialdone call his law firm from the courtroom to tell Wendy Suttlage to come to court, and it authorized Scialdone to tell Suttlage only "to come over here." As the trial court listened to Scialdone make the telephone call, it said, "Tell [Taylor] to come too." Scialdone responded Taylor had "a room full of people at the office" but said he would "tell [Taylor] to leave them there" and come to court.

When Taylor and Suttlage arrived, the trial court excluded Taylor from the courtroom and questioned Suttlage under oath. The court then brought Taylor back into the courtroom, placed him under oath, and questioned him, as well. Only after questioning Taylor did the trial court learn of his involvement in procuring the document at issue. Thus, Taylor's role in the

alleged contempt could not properly be punished summarily. Taylor surely knew his actions would result in the submission of the document into evidence, and this fact is relevant to whether his behavior was contemptuous, but it is not the test for determining whether his contemptuous acts, if any, could be punished summarily.

Thus, we reverse Taylor's contempt conviction.

### 3. Finding of Contempt Against Jones

The trial court found Jones in summary contempt under Code § 18.2-456(1) and (3). Based on our constitutional due process analysis above, we hold these subdivisions of the statute may be constitutionally applied to permit summary punishment for contempt only to the extent that they proscribe behavior Jones engaged in "under the eye of the court" and that was "actually observed by the court." Oliver, 333 U.S. at 275, 68 S. Ct. at 509, 92 L. Ed. at 695. "If some essential elements of the offense [were] not personally observed by the judge, so that [she had to] depend on statements made by others for [her] knowledge about these essential elements, due process require[d] . . . that [Jones] be accorded" his procedural due process rights. Id. at 275-76, 68 S. Ct. at 509, 92 L. Ed. at 695.

Plainly, the act of offering into evidence a document bearing the screen name "westisanazi" could be found to constitute both the type of "[m]isbehavior in the presence of the court" punishable under Code § 18.2-456(1) and "[v]ile, contemptuous or insulting language" meeting the additional requirements of subsection (3) of that same code section. Thus, the person offering the document bearing that screen name into evidence could have been subject to summary punishment for contempt on that basis. As with the case of the document alleged to be fraudulent, the offeror was charged with "know[ledge of] the contents of [the] document[] he present[ed] . . . , and presentation [was] a representation that this duty ha[d] been performed." Ford, 9 F.2d at 991.

- 36 -

However, here, the trial court did not summarily convict the *offeror* of the exhibit, Scialdone, for contempt based on the presence of the "westisanazi" screen name on the exhibit. Instead, it placed Suttlage, Taylor, Scialdone, and Jones under oath and sought to elicit an admission from one of them about who had devised the derogatory screen name and caused it to be included on the exhibit. It was upon the direct question of the trial court—"You [said you] ran . . . off [that copy of the chat room rules], Mr. Jones. Did you do it?"—that Jones indicated he had in fact typed the derogatory screen name. The trial court did not observe Jones's use of the screen name and had to rely on Jones's confession to establish his involvement in the contempt.

As set out above, a court has the power to punish summarily "*only* charges of misconduct . . . [of which] *all of the essential elements . . . are under the eye of the court [and] are actually observed by the court*." Oliver, 333 U.S. at 275, 68 S. Ct. at 509, 92 L. Ed. at 695 (emphases added). In cases of misbehavior for which the judge lacks personal knowledge of any of the "essential elements" and "*is informed thereof only by the confession of the party,* or by the testimony under oath of others," the court may not punish the contempt summarily. Savin, 131 U.S. at 277, 9 S. Ct. at 702, 33 L. Ed. at 153 (emphasis added); see Groppi, 404 U.S. at 504, 92 S. Ct. at 587, 30 L. Ed. 2d at 639 ("Where a court acts immediately to punish for contemptuous conduct committed under its eye, . . . there is no question of identity . . . ."). Because the trial court had personal knowledge of the derogatory language, which was contained in an exhibit offered into evidence, but did not have personal knowledge of Jones's status as a participant in the use of that language, it was not entitled to punish him summarily.

Thus, we reverse Jones's contempt conviction and remand for additional proceedings consistent with this opinion.

<u>4.  Sufficiency of the Evidence to Support Scialdone's and Taylor's Convictions</u>

Although we reverse on procedural grounds, we address Scialdone's and Taylor's

sufficiency-of-the-evidence arguments[12] insofar as necessary to assure that their retrial on

remand will not violate double jeopardy:

> If the evidence adduced [in the contempt proceeding] was
> insufficient to convict [either appellant], he is entitled to an
> acquittal; if he is so entitled, a remand for retrial would violate the
> Constitution's prohibition against double jeopardy.  As established
> in <u>Burks v. United States</u>, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d
> 1 (1978), a full sufficiency analysis is required to satisfy the
> mandate of the Double Jeopardy Clause of the federal Constitution.

<u>Parsons v. Commonwealth</u>, 32 Va. App. 576, 581, 529 S.E.2d 810, 812-13 (2000).  "In making

this assessment, we consider all admitted evidence," without regard for whether it was properly

admitted or is likely to be admitted in any subsequent retrial.  <u>Hargraves v. Commonwealth</u>, 37

Va. App. 299, 312-13, 557 S.E.2d 737, 743 (2002).  And, as in the case of any review of the

sufficiency of the evidence in a defendant's appeal, "'we must view all the evidence in the light

most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly

deducible therefrom.'"  <u>Id.</u> at 312, 557 S.E.2d at 743 (quoting <u>Clark v .Commonwealth</u>, 30

Va. App. 406, 409-10, 517 S.E.2d 260, 261 (1999)) (other citation omitted).

Viewed under this standard, the evidence admitted in the trial court was sufficient to

support a finding that Scialdone and Taylor engaged in misbehavior constituting contempt.[13]

<u>See, e.g.</u>, <u>Carter</u>, 2 Va. App. at 396, 345 S.E.2d at 7 (defining contempt as, *inter alia*, "'an act in

---

[12] Jones, too, attempted to challenge the sufficiency of the evidence to support his conviction, but his petition for appeal was denied as to that issue.

[13] We need not consider whether Scialdone's and Taylor's behavior violated a particular subsection of Code § 18.2-456.  That code section does not define the outer limits of behavior that constitutes contempt for purposes of a sufficiency analysis; rather it merely sets out the categories of contempt for which the legislature has purported to authorize *summary* adjudication and punishment.  <u>See</u> <u>Robinson</u>, 41 Va. App. at 144-46 & n.7, 583 S.E.2d at 62-64 & n.7.

disrespect of the court or its processes, or which obstructs the administration of justice'" (quoting 4A Michie's, supra, § 2)).  The trial judge found Taylor intentionally "alter[ed] the document that was to be presented to this court" by removing the print and copyright dates and that Scialdone actually "offer[ed] that fraudulent document to the court."  For purposes of assessing application of the Double Jeopardy Clause, we hold the evidence supports those findings.

The evidence supported a finding that when Frankie Dulyea retained Scialdone and Taylor to represent him, he provided Taylor with a two-page copy of the Yahoo chat room rules dated 2005 and bearing a screen name of "pdulyea."  Taylor admitted he was very familiar with the rules generally because while "[they] were in preparation for the case, [they] had looked at [the rules] multiple times because . . . [the rules were] crucial to [the] case."  Additional evidence established that on the Sunday prior to trial, Taylor had his secretary, Wendy Suttlage, print a one-page copy of the rules for him from Yahoo and that she used the screen name "wndydpooh" in order to do so.  When preparing for trial, Scialdone and Taylor had been unable to locate the copy of the rules their client had given them.  As a result, at trial on the morning of July 12, 2006, Scialdone first offered into evidence a copy of the rules bearing a print date of July 11, 2006, and the screen name "westisanazi."  Scialdone testified that after the trial court rejected the rules he originally proffered and said he would "have to have the rules that were in place in 2005" if he wished to pursue a particular line of questioning related to the rules, he "realized we needed to find the [copy of the rules the client had provided]," and he "asked [Taylor] to look in the file to see if they could find it."

Taylor admitted Scialdone called him at the office on July 12, 2006, and asked him to look for "the [copy of the rules] that the client . . . dropped off," although Taylor later claimed he thought any copy of the rules would suffice.  Taylor then provided to Scialdone a one-page copy of the rules that had been retrieved and printed by someone using the screen name "wndydpooh,"

the screen name used by Suttlage.  That copy of the rules, when offered into evidence, bore no print date or copyright date, and the trial court found, "you can see a line [on the second copy of the rules offered into evidence] that is clearly where the copyright was and it's been altered," where "something was laid over on the copyright date and it was copied on a copier or it was whited out or something."  Scialdone, Taylor, Jones, and Suttlage all denied altering the subject "wndydpooh" chat room rules in any way.

The trial court had Ms. Suttlage retrieve and print copies of the Yahoo chat room rules from each of the computers in the firm's office.  All those printouts bore print and copyright dates.  By comparing the various rules printouts Ms. Suttlage generated to the second set of rules offered into evidence, the trial court determined the only printout that matched the spacing, margins, and other formatting of the second set of rules was the printout generated on Taylor's computer.  The judge found this printout was an "exact replica" of the second set of proffered rules except for the presence of the copyright and print dates.  This evidence, taken as a whole and viewed in the light most favorable to the Commonwealth, supported a finding that Taylor, although he denied doing so, intentionally removed the copyright and print dates from the copy of the chat room rules he provided to Scialdone to offer into evidence as the 2005 rules, behavior "'in disrespect of the court or its processes, or which obstructs the administration of justice.'"  Id. (quoting 4A Michie's, supra, § 2).

This same evidence supported a finding that Scialdone's behavior also constituted contempt.  Whether Scialdone knew the document had been altered was not dispositive.  See Ford, 9 F.2d at 991-92 (holding that submission of a document containing falsehoods is punishable as contempt and that "lack of actual knowledge [of the falsehoods] does not constitute a defense, but only an extenuating circumstance in mitigation").  Further, if Scialdone had made reasonable inquiry of his client prior to offering the second set of rules into evidence,

he could have ascertained based on the different screen names and the fact that the second set of rules comprised one page rather than two that the second set of rules was not the set his client had printed in 2005 and provided to his attorneys.

Thus, remand for retrial of Scialdone and Taylor does not offend double jeopardy principles.

III.

For these reasons, we hold each of the appellants was denied rights to due process, and we reverse and remand for further proceedings consistent with this opinion if the trial court and the Commonwealth be so advised.

Reversed and remanded.

Kelsey, J., dissenting.

The majority's discourse on due process cuts a broad path through the bedeviling principles of contempt law. Problem is, none of it is properly before us.

On appeal, the defendants — two lawyers and a then-third-year law student — concede they did not raise any specific due process objections prior to filing their notices of appeal. Nor did they at any time file a motion to reconsider, to vacate, to set aside, or any other motion *specifically asking the trial court to reverse its decision*. What they filed was a motion to stay the jail sentence pending appeal. See Code § 19.2-319. No Virginia appellate court has ever held, until now, that a motion to stay a jail sentence pending appeal preserves issues never once raised either prior to the conviction or in a motion to set aside after the conviction.

To be sure, the Virginia Supreme Court rejected just this sort of reasoning in Nusbaum v. Berlin, 273 Va. 385, 641 S.E.2d 494 (2007). In that case, a lawyer was held in direct, summary contempt and complained on appeal that he was entitled to the due process protections available for indirect, plenary contempt. Prior to the entry of final judgment, the lawyer stated "specific objections" to the summary proceeding (very similar to the ones asserted here) asserting that the trial court "violated his due process rights." Id. at 404, 641 S.E.2d at 504. The lawyer advised the trial court that he wanted to make it aware of his specific objections and, by doing so, "make sure" he "preserved any right of appeal" of the contempt finding. Id. He did not, however, ask the trial court to "*reconsider and set aside* the finding of contempt of court for those reasons." Id. (emphasis added). After hearing the lawyer's specific objections to the contempt finding, the trial court entered a final order confirming its previous bench ruling finding the lawyer in contempt.

On appeal, the lawyer argued that, "having made the circuit court aware of his objections, he had no obligation to ask the court to reconsider any matter since the court had the opportunity,

- 42 -

within 21 days of entering the final order, to vacate that order and change its rulings." Id. at 402, 641 S.E.2d at 503. The Virginia Supreme Court flatly disagreed. The lawyer could not complain on appeal that the trial court erred in not vacating its contempt finding on due process grounds, Nusbaum held, because the lawyer never once asked the court to do so. "Those issues, whether the circuit court violated his due process rights by summarily convicting him of indirect criminal contempt, with no notice of the charge, no plenary criminal hearing, and no substitution of the Commonwealth as the prosecuting party, are therefore waived on appeal." Id. at 406, 641 S.E.2d at 505 (citing Rule 5:25).

In our case, the defendants made even less of an effort to preserve the due process issues than the lawyer did in Nusbaum. Here, the defendants raised their due process arguments only in support of their motion for a stay of the jail sentence pending appeal. At no point did they ever ask the trial court, either orally or in writing, to set aside its contempt findings based upon these objections. As in Nusbaum, the trial court did not vacate its contempt findings based upon the after-the-fact due process objections because, quite simply, it was not asked to do so.

The majority's contrary view imposes upon a trial court the *sua sponte* obligation to vacate a conviction on grounds raised for the first and only time during a motion for stay pending appeal when the party standing to benefit from the vacature, the defendant, conspicuously chooses *not* to seek that relief. That the defendant does not ask the trial court to vacate the conviction does not matter — the court should grant it anyway. I find this conclusion hard to understand and harder still to defend.

Equally unconvincing is the effort at distinguishing Nusbaum. "Most importantly," the majority reasons, the trial court in our case "*had, in fact, read*" the defendant's due process arguments and thus was "well aware" of the specific objections being asserted. *Ante*, at 20 (emphasis in original). That is "key" in distinguishing our case from Nusbaum, the majority

emphasizes. *Ante*, at 23. In Nusbaum, however, the lawyer specifically advised the trial court in open court of each of his due process objections. It could have just as easily been said in Nusbaum that the trial court *had, in fact, heard* the due process arguments and thus was *well aware* of the lawyer's due process arguments. What the majority sees as the "most" important and "key" difference between our case and Nusbaum is, to me, no difference at all. See *Ante*, at 20, 23.

In short, if procedural default applies to the lawyer in Nusbaum, it applies all the more to the defendants in our case. The majority's holding to the contrary is as unpersuasive as it is unprecedented.

I respectfully dissent.